## TAYLOR *v.* STATE.

### [66 South. 321.]

HOMICIDE. *Corpus delicti. Infanticide.*

> Where in a prosecution for infanticide the testimony of the physicians who testified for the state, discloses that the child was probably born alive, and that in their opinion, if born alive, it died from suffocation brought about by some unknown cause; and the examination of the body of the child by these physicians failed to disclose any evidence of violence to its person, and their opinion that it died from suffocation was based upon the fact that their examination also failed to disclose any reason why the child should have died from a natural cause, the testimony was insufficient to warrant a conviction.

APPEAL from the circuit court of Madison county.

HON. W. A. HENRY, Judge.

Charlotte Taylor was convicted of infanticide and appeals.

Appellant was indicted for the murder of the newborn infant of her daughter, Minnie Taylor; and from a conviction and a sentence to the penitentiary for life she appeals.

The principal witnesses for the state were two physicians, Drs. Howell and Rhyne.

Dr. Howell testified that he was called to attend Minnie Taylor, the daughter of the defendant, about seven-thirty o'clock in the evening; and upon entering the house he heard a noise, which he thought was the cry of a baby, but upon making inquiry of the defendant, he was informed that there was no baby in the house, and that the noise was probably made by a cat or dog. Upon examination of defendant's daughter he found positive evidences of her having given birth to a child, and asked defendant to produce the child; but the existence of the child was denied by the defendant. He made a search

of the place, and finally discovered the dead body of the infant between the mattresses of the bed on which the defendant's daughter lay. He reported the matter to the sheriff, and Dr. Rhyne was then called in, and the two doctors and the sheriff visited defendant's house disinterred the body of the child and made a post-mortem examination. The child weighed nine pounds, and was fully developed, and apparently strong. Its lungs were removed, and, upon being placed in water, floated. According to the doctor's testimony this test showed that air had gotten into the lungs, and in his opinion indicated that the child had been born alive. There was no evidence of violence on the child's body to show its death by violence. Dr. Howell testified that its death was probably due to suffocation. There was no direct evidence connecting the defendant with the death of the infant. On appeal it is contended that the *corpus delicti* had not been sufficiently established to warrant a conviction: First, that it was not sufficiently shown that the child was born alive, and that the fact that the lungs floated in water was only one of many tests known to science for determining the fact that the child had been born alive; second, that it is not sufficiently shown that the child came to its death through a criminal agency, and there is no proof of violence; the doctor's testimony that the child probably came to its death by suffocation being based upon the fact that the examination showed no other cause of death, either from violence or natural causes. The testimony showed no motive on the part of the defendant for wishing to kill the child.

*Powell & Thompson* for appellant.

The *corpus delicti* in this case consist of two things, to wit: The birth of the child alive, and its death by criminal agency. The *corpus delicti* must be established by the state beyond all reasonable doubt. *Pitts* v. *State,* 43 Miss. 472.

We contend that, subject to this test, neither branch of the *corpus delicti* has been proven. It is true that two of the doctors testified that the lungs were subjected to the water test and the indications were that the child had breathed, but when we remember that this test is only one of many which might have been tried, and the further fact that this was the first test ever made by these doctors, this evidence does not leave the mind entirely free from every reasonable doubt in the matter.

Now as to the second branch of the *corpus delicti,* to wit: Death by criminal agency. It does seem that the state has only raised a suspicion of guilt. The evidence shows only that the child was once probably alive and was afterwards found dead, but there was no mark of violence on its person and no motive why defendant should wish to kill the child. If defendant wished to conceal the birth of the child, why send for Dr. Howell? Why not get the midwife next door, who had delivered defendant of fifteen children? If defendant knew of the birth of the child before Dr. Howell came, why should she send for him or why, when he came, should she say the child had not been born when she was bound to know that he would find out the truth on examination?

If it should be urged that Dr. Howell, when he came into the room, heard something like a child's voice, we say that even the doctor was not certain in regard to the noise, and further that if it was a child's voice, then defendant did not stifle it, because the doctor says she remained in the room with him for some half or three-quarters of an hour.

It seems to us from the meager testimony in the case as if the child was smothered by its mother, if it was really born alive. The court will notice from the evidence that the patient was lying with her head at the foot of the bed when the doctor arrived. It appears that the naval cord was torn and not cut, indicating that the child was snatched away; and the child was found, so far

as I can determine from the evidence, under the pillow at the foot of the bed, and this place was not searched as, testified to by the doctors. Now under this state of facts is it not highly probable that the mother in her frenzy reversed her position in the bed from head to foot, and tore the child from herself and rolled on it and thus smothered it? If the defendant delivered the child, why should she not cut instead of tear the child aloose, and surely, having had fifteen children of her own, she was not a novice at the business.

*Nowland M. Reid,* for appellant.

The facts, as disclosed by the record in this case, were utterly insufficient to support a verdict of guilty, and the peremptory instruction asked by appellant should have been granted. Indeed, there was no such proof of the *corpus delicti* as would have warranted the admission of evidence of a confession, or to have sustained a verdict of guilty, had there been such a confession.

According to Wigmore, there is some diversity of opinion, in different jurisdictions, as to what constitutes the essential proof of the *corpus delicti.* In some jurisdictions, only the loss or injury need be shown by evidence *aliunde* the confession. In others, both the loss or injury and a criminal agency as the cause thereof, must be shown; while in others both of these elements must be shown, together with proof of the identity of the person making the confession as a criminal agent. Wigmore on Evidence, sec. 2072.

As early as 1870, this court adopted the second rule above mentioned, in the Pitts case. Says the court in that case, speaking through Chief Justice Peyton: "In order to arrive at a correct conclusion, it is necessary to understand, in the first instance, what is meant by the terms '*corpus delicti,*', or, in other words, the body of the offense charged. *Corpus delicti* is made up of two things: First, certain facts forming its basis, and sec-

ond, the existence of criminal agency as the cause of them. In case of felonious homicide, it consists of two fundamental facts. First, the fact of the death of the deceased; second, the fact of the existence of criminal agency as the cause of the death. The first of these constituents is always required to be proved, either by direct testimony, or by presumptive evidence of the strongest kind, and the second of these constituents becomes a proper subject of presumptive reasoning upon all the facts and circumstances of the case. The *corpus delicti* must be proved beyond reasonable doubt, by evidence other than such extra-judicial confession." *Pitts* v. *State,* 43 Miss. 472. This statement of law seems entirely in accord with all modern reasoning upon the subject, and has been followed and quoted with approval by this court upon several occasions.

In a Colorado case, *Ausmus* v. *People,* will be found a very comprehensive review of judicial utterances, and the text of law-writers upon this subject. But nowhere can be found a more succinct statement than in the Pitts case, *supra,* which is identical with the definition given in Anderson's Law Dictionary, quoted with approval by the Colorado court. "The *corpus delicti* in murder has two components: Death as a result, and the criminal agency of another as a means." *Ausmus* v. *People,* 47 Colo. 167, 19 A. & E. Ann. Cases, 491.

Another good statement of the rule is by this court in the case of *Haynes* v. *State,* where the appellant stated in advance to his stepdaughter, and following such declaration, took the child under his arm and left with it, after which the child was never seen. Upon his arrest the defendant confessed, and the court says: "The burden remains with the state to show that the child is dead, and that the defendant killed it." *Haynes* v. *State,* 27 So. 601.

There was no direct testimony showing the death of the child, nor was there such strong presumptive evidence

as the law requires, of its death. Taking the testimony as a whole, given by physicians of little or no experience in such matters, the record discloses very little testimony, except their own *ipse dixit* to have warranted the jury in believing that the child was born alive.

*Geo. H. Ethridge,* for the appellee.

It is strenuously insisted that the evidence is insufficient to sustain a conviction in this case, but I think the appellant's attorneys have underrated the probative force of the evidence. I know that they have misconceived some of the evidence. They claim that Charlotte sent for Dr. Howell. The proof does not show this. It merely shows that he was requested to go out to her house, but does not show that she sent for him. I think the record would better justify the conclusion that it was some one else who sent for him. When he got out there the child was born, and there cannot be a shadow of doubt as to this fact. There can be no doubt that the birth was extremely recent. When Dr. Howell went in, he heard a noise like a child crying. He asked about the baby but was told none had been born and was told this by the appellant. He was also told by her that she had been with Minnie, the daughter all the time. Therefore she was bound to know of the birth, and was bound to know what became of the child. She persistently denied the birth, even when confronted with the afterbirth and the laceration of the privates of the daughter. The child is shown to have breathed. It was heard to cry. It was fully developed in every respect and it did not bleed to death. Every fact demonstrates, as far as it is possible to demonstate, that it lived. Some one tore the cord, separating the child from the mother. Who did it? The girl was in bed and the mother was present, and no one else was shown to have been present. Some one was responsible for the death of the child. It is mocking common sense to indulge in presumptions and possibilities on the facts

in this record. The appellant was the only person who was able to look after this child and on her own statement to the doctor, was there every minute of the time during labor. She fabricated evidence as to when her daughter became sick, if the witnesses she introduced to defend herself, are to be believed. According to them, her daughter was sitting on the gallery and had been in the garden at a time she relates to the doctors she was sick with cramps. When the sheriff goes to her house the next morning she still denies that a child was born, until told that if the child is not produced, she will be arrested, and then she tells where it lies buried. Who buried it? Nobody is shown to have seen it but her, who was able to bury it! Her conduct on this occasion speaks louder than the voice of thunder proclaiming her guilt to every one who listens to the voice of reason. Counsel argue about the motherly instinct and say why should she•kill the child if she was already suffering disgrace from having had bastards of her own? In my opinion, shame had not the remotest influence in the death of this baby. It was, in my opinion, the fact that the child would have to be supported and would be troublesome and expensive that caused its life to be pressed out behind the pillows or beneath the bed on which it was born. Circumstances disclosed in this record will not permit of a presumption of stillbirth or natural death. If that had been the case, it would have been promptly proclaimed and there would not have been any fear in any one's mind about the matter. Especially would this have been true after the doctor told that many children were stillborn. I submit that there is no merit in the appeal and that the judgment should be affirmed.

SMITH, C. J., delivered the opinion of the court.

The evidence in this cause is wholly insufficient to support the verdict. At most, the testimony of the physicians who testified on behalf of the state discloses that

the child was probably born alive, and that in their opinion, if born alive, it died from suffocation brought about in some unknown way. The examination of the body of the child by these physicians failed to disclose any evidence of violence to its person, and their opinion that it died from suffocation seems to be based upon the fact that their examination also failed to disclose any reason why the child should have died from a natural cause.

*Reversed and remanded.*