THE STATE OF WYOMING,

*Plaintiff and Respondent*

vs.

DARLENE OSMUS,

*Defendant and Appellant.*

(No. 2590; November 16th, 1954; 276 Pac. (2d) 469)

For the defendant and appellant the cause was submitted upon the brief and also oral argument of Brooke Wunnicke of Cheyenne, Wyoming.

For the plaintiff and respondent the cause was submitted upon the brief of Howard B. Black, Attorney General; Paul T. Liamos, Jr., Deputy Attorney General; Robert A. McKay, Assistant Attorney General, all of Cheyenne, Wyoming, and Raymond B. Whitaker,

County and Prosecuting Attorney, Natrona County, Casper, Wyoming, and oral argument of Robert J. Murphy, Deputy County and Prosecuting Attorney of Natrona County, Casper, Wyoming.

## OPINION

Blume, Chief Justice.

In this case the defendant was accused of murder in the first degree for killing her new-born child. She was convicted by a jury of manslaughter. The jury added to the verdict a recommendation of a minimum sentence. The court sentenced her to prison for the minimum period of two years and the maximum period of four years. From that conviction and sentence the defendant has appealed. We should mention, before proceeding further, that her counsel on this appeal was not her counsel in the trial of this case. The facts as disclosed by the record are about as follows:

Defendant, an unmarried woman, not yet 21 years of age on March 5, 1952, was raised under a religious atmosphere in Colorado, graduated from high school and then took a course in nursing for some two years,

but was dismissed from the school as a person not properly fitted to become a nurse and she never became a graduate nurse. She gained some medical knowledge but knew nothing of obstetrics. She went to Casper in this state in January 1952 to help take care of her sister-in-law, who had recently given birth to a child. She worked up to March 5, 1952, as well as immediately after that date up to March 14, 1952, when she was arrested. She showed no signs of pregnancy whatever as testified to by witnesses for the state as well as defendant. She lived with her brother and sister-in-law in a three-room apartment, consisting of a living room, which was also used as a bedroom, a kitchen and a bath, the latter being separated from the living room by a kitchen. Defendant slept on a cot in the bathroom. There was a toilet in this room, apparently on a platform somewhat higher than the floor, and with two or three steps down to the floor. About midnight of March 5, 1952, defendant gave birth to a fully developed male infant, weighing 7½ pounds, which she claimed was born dead. She kept it under the cot for about three days, wrapped it in a newspaper, and thereafter took it along the highway out of Casper and laid it close to the highway where a game warden, who had observed her and was suspicious of the circumstances, found it. The brother and sister-in-law of defendant both testified that they heard no outcry or any commotion of any kind in connection with the birth of the infant and knew nothing of it until the defendant was arrested.

The gist of the defendant's testimony is as follows: She did not know that she was pregnant and did not have the usual indications in that connection and had had regular menstrual periods. On March 5, 1952, she had no unusual symptoms of any kind until the went to bed about eleven o'clock. At first she thought she

was having menstrual cramps and then felt that she had to go to the bathroom. She walked up to the toilet, sat down, had a "large" cramp, and then fell against the rail in front of her. She became unconscious for a few seconds or minutes, but when she regained consciousness, she picked up the baby which was still attached to the placenta. She took some tissue and wiped its mouth and nose to see if it would breathe and held the baby upright, but the baby was dead. She was weak and frightened when the birth happened but did not cry out. After she wiped the baby's face and nose, and it was not breathing she took a scissors from a ledge back of the toilet and cut the umbilical cord close to her body. She remained seated while holding the baby, then everything started to get black; she walked down the steps with the baby and she "passed out" from dizziness and she did not regain consciousness until about 5:30 in the morning. She did not have much hemorrhage and did not pass the placenta until the next day. The baby was on the floor; she picked it up and laid it on the cot. It was still blue. She then wiped up the blood on the floor beside the toilet. She thought of then telling her brother or the police, but concluded not to do so, wrapped up the baby in a newspaper and disposed of the body as already mentioned. She did not harm the baby in any way but did all she could to save its life. She helped to prepare breakfast on the morning of March 6th, stayed at home that day. On March 7th she went to a show with some girl friends and on March 8th, she washed and cleaned house. On March 10th she went to the Shell Oil Company, took a physical examination and passed. She further testified that she bled some, but not much, on the sheet because she had no Kotex on. The significance of that has not been shown. We might incidentally mention the fact that it is stated in Taylor's Medical Jurisprudence, page 427, that cases

do occur in which a woman who is pregnant has no knowledge of her pregnancy. Dr. Stuckenhoff, however, testfied that defendant told him that she felt labor pains in the afternoon of March 5th, and Dr. Hansard testified that defendant told him that she had not menstruated since June 1951.

Medical Testimony

Dr. Thaler testified at the Coroner's Inquest. He was not present at the trial, being absent in Chicago, but his testimony at the inquest was admitted at the trial. He made the post-mortem examination along with Dr. Stuckenhoff. There was blood in the pleural cavity. He did not conclude, definitely, that the child was born alive. There were no marks of violence on the body. There was some mucus all over the body of the child, the face of the infant having less of it than the other parts of the body. The infant was a full term infant. The lungs were aerated and floated in water. There was a showing of gas in the stomach. The gas in the stomach could have existed if the child was not born alive, but that is not true as to the air in the lungs. There must have been an infection in the lungs, suggesting pneumonia, but there was no evidence of trauma. There were fragments of Kleenex tissue on the lips and tongue. Some 13 or 14 inches of the umbilical cord was still attached and was dry.

The testimony of Dr. Stuckenhoff, a witness for the state, was substantially as follows: The infant was a full term infant, weighing 7½ pounds. The cord was still attached to the child, and was dry, and there was no evidence that it was tied. The skin was normal in appearance, slightly dried, still very flexible and of good consistency. The nails, hair and other parts were fully developed. There was a distinct bluish discoloration from the central portion of the neck upward, in-

volving the entire head, which, of course, could have happened before death, or the changes could have happened after death. There were some bluish spots in various parts of the body which, of course, is the thing that you usually see in post-mortem examinations. The lips were dried and crusted; the cornea of the eye was dull and opaque; there were no broken bones. There was no evidence of any violence or any trauma or of any scratches. He did not find that the defendant used any medicine to do away with the baby. The lungs seemed to contain some air and floated in water, often a criterion whether the child lived after birth or not. There was some bloody fluid in the lungs as well as in the chest cavity between the pleura and the chest wall. There was gross red discoloration of both lungs with bloody extravasations suggesting congestion. The abdomen was partially extended. Upon opening the skull, there was a moderate amount of bloody exudate, and not clotted, suggesting congestion. In order to expand the lungs, the infant must have made an effort toward respiration. The lungs were not completely filled. The infant was born with pneumonia. In his opinion, the infant was born alive and the cause of death was a combination of asphyxia and pneumonia. With modern medical care, physicians seldom lose a child born with pneumonia. The infant had a heartbeat; it would not breathe without it.

"Q. What do you believe caused this asphyxiation?

A. It is pretty hard to say.

Q. There is no way of knowing is there?

A. No.

Q. From a medical point of view?

A. No. Asphyxiation can be caused in a number of ways; by mucus, by something over the nose and mouth so that it can't breathe — there are a num-

ber of ways. Drowning is actually asphyxiation, you know.

Q. Pneumonia, itself, could cause asphyxiation, could it not?

A. I don't think it was extensive enough in this instance to cause asphyxiation."

There was some Kleenex attached to the tongue, there were only fine shreds, not sufficient to interfere with breathing. He did not know whether the baby breathed or had circulation of the blood after the severance of the umbilical cord, because he did not know when that was severed. He felt in his own mind that the baby breathed and that it swallowed because of certain findings. The cord does not necessarily have to be detached; it could be an hour of two before detaching the cord. The heart beat in the cord soon disappears after birth and then, of course, there is no connection (with the mother). Physicians usually wait in tying the cord until the heart beat in the cord has ceased. Then there is no continuity. Nature seals off the cord after it is cut. When the heart beat disappears in the cord, physicians normally feel that there is no further circulation between the placenta and the baby. It was difficult for him to believe that defendant passed out while on the toilet without falling to the floor, or that—with the rooms as they were—nobody knew of the delivery of the child. Not every baby cries when born. And not every one that drowns has water in the lungs. The greatest danger point in the life of an infant is within the first few minutes after birth.

Dr. W. C. Russum of Omaha, Nebraska, a pathologist to whom the lungs, heart and portions of the liver of the infant were sent for examination, was a witness for the state. His testimony is in substance as follows: In his opinion the infant was born alive.

Its heart and thymus were normal. It died of pneumonia and diffuse hemorrhage in the lungs causing asphyxia and probably a combination of both. He stated that the pneumonia was acute, therein apparently differing with Dr. Stuckenhoff. With proper medical care, the infant had a good chance to survive. Again he stated that with the degree of pneumonia it had it *might* have survived. As the result of hemorrhage, here was blood in many of the air cells. Some of them were filled with blood, some of them were over-distended with air—the infant tried to breath too much. The breathing was not normal. It is not likely that cutting the umbilical cord caused the child to bleed to death, since the blood would clot. The heart functions and beats while carried in the mother, and has a circulation before delivery. The infant presumably breathed before the umbilical cord was cut. Under certain conditions, a baby can and does breathe while it is passing through the vaginal canal. Many babies born with pneumonia do not survive, the percentage of survival is uncertain and speculative. It is not uncommon to have babies born in toilets and under similar conditions. Asphyxia could have been caused by suffocation—placing tissue over the face and nose ——or by the baby's face being placed down in water, as in a toilet. Asphyxia may be antenatal or occurring during birth or after birth. Some other items of evidence will be mentioned in the course of this opinion. And some additional and important testimony of Dr. Russum will hereafter be set out verbatim.

I. Admissions.

When defendant testified, she stated that she did not know she was pregnant until the time she gave birth to the child in question. She had previously given a statement to the prosecuting attorney to the effect that she found out she was pregnant at the time she

came to Casper. It is contended on behalf of the defendant that the admission in evidence of the statement to the prosecuting attorney was reversible error for the reason that at that time she was virtually under arrest and that it was not shown as voluntarily made. We are inclined to think there is no merit in that contention. The statement was not a confession. 22 C.J.S. 1422. Considered in connection with her additional testimony that the child was born dead, the statement was rather a statement of innocence, and was in accord with her testimony except only on the point as to whether she knew that she was pregnant. It is stated in 22 C.J.S. 1252: "A distinction has been drawn between inculpatory admissions directly relating to the facts or circumstances of the crime and connecting accused therewith, and inculpatory admissions as to collateral facts. The former must be shown to be voluntary, while the latter are admissible without preliminary proof that they were voluntary." A statement that defendant knew she was pregnant when she came to Casper was merely a statement of a collateral fact—merely a statement in accordance with the laws of nature. See Strand v. State, 36 Wyo. 78, 252 P. 1030. Contrary to the contention of the state, as will be disclosed in the further discussion of this opinion, her statement was of no importance except that when she testified on the witness stand and contradicted her previous statement as to her knowledge of her pregnancy, that affected her credibility.

II. Instruction As To Cause Of Death.

It is assigned as error herein that Instruction No. 7, as given by the court, is erroneous. That instruction is as follows:

"You are instructed that the acts of the accused must cause death in order to constitute murder or

manslaughter, but such acts need not be the direct and immediate cause of death."

Attention here is directed to the last part of the instruction. We need not enter into a detailed examination of the meaning of "direct and immediate cause" in various situations. See Words and Phrases under "directly" and under "direct cause" and Prosser on Torts, p. 347. We cannot conceive of any situation in this case which the court may have considered as giving rise to the charge relating to "direct and immediate cause of death" unless it be the lack of providing for medical aid. We shall discuss that matter presently. In the case of Anderson v. Steinle, 289 Ill.App. 167, 6 N.E. (2d) 879, 881, the court stated: "The phrase 'direct cause' has been held to mean, 'the active, efficient cause that sets in motion a train of events which brings about a result without the intervention of any force started and working actively from a new and independent source.'" Under this definition, if the cause was not direct, it was remote.

In the case of Godwin v. Atlantic Coast Line R. Co., 120 Ga. 747, 48 S.E. 139, 141, the court said: "In discussing legal causation, the phrase "proximate cause' does not necessarily mean that which is nearest, but referred to as the 'immediate and direct' cause, as opposed to 'remote.' And the words 'proximate,' 'immediate,' and 'direct' are frequently used as synonymous." Then the foregoing instruction might be construed as meaning that the defendant could be convicted, even though her acts constituted merely a remote cause. Courts do not consider a remote cause as an efficient or proximate cause. Lemos v. Madden, 28 Wyo. 1, 200 P. 791. To say the least the instruction was confusing, leaving the jury to guess at its meaning, and should not have been given in so far as the last part of the sentence of the instruction is concerned

without at least further explanation. A cause must be the efficient, commonly called the proximate, cause or it is not a cause at all in law. See 38 Am. Jur. 701, § 54. That is the rule in the law of torts and we see no reason why it should not apply here.

III. Nonfeasance Under Statute — Instruction

The state contended that the defendant was guilty of nonfeasance under the provisions of Section 58-101, Wyo. Comp. St. 1945, reading as follows:

"It shall be unlawful for any person having or being charged by law with the care or custody or control of any child under the age of nineteen (19) years knowingly to cause or permit the life of such child to be endangered or the health or morals or welfare of such child to be endangered or injured, or knowingly to cause or permit such child to be in any situation or environment such that the life, health, morals, or welfare of such child will or may be injured or endangered, or wilfully or unnecessarily to expose to the inclemency of the weather, or negligently or knowingly abandon or fail to provide the necessities of life for such child, or to ill-treat, abuse, overwork, torture, torment, cruelly punish such a child, or to negligently or knowingly deprive or fail to furnish necessary food, clothing or shelter for such child, or in any other manner injure said child."

An instruction setting out the statute was given by the court, and the state's counsel in their arguments to the jury strongly relied upon this statute for conviction. The contention is that since defendant did not give the infant the care required by the statute, she was guilty of an unlawful act, and since the infant died, therefore the case comes under Section 9-205,

Wyo.Comp.St. 1945, providing that whoever kills a human being in the commission of an unlawful act is guilty of manslaughter. That section reads as follows:

"Whoever unlawfully kills any human being without malice, expressed or implied, either voluntarily, upon a sudden heat of passion, or involuntarily, but in the commission of some unlawful act, or involuntarily, but in the commission of some unlawful act, or by any culpable neglect or criminal carelessness, is guilty of manslaughter, and shall be imprisoned in the penitentiary not more than twenty (20) years."

Section 58-101, supra, relates to a really living child, while in the case at bar one of the questions is as to whether or not the child was born alive. The section does not directly provide or even intimate that it applies to a child such as is involved in this case. See Bradley v. State, 79 Fla. 651, 84 So. 677. 10 A.L.R. 1129. In Singleton v. State, 33 Ala.App. 536, 35 So. (2d) 375, again mentioned hereafter, the court specifically distinguished between want of care of children as ordinarily understood, and want of care of a new born child during the time of birth, holding that criminal conduct cannot be attributed to nonfeasant acts of a mother during the travail of childbirth, even though the child should die. If that rule is applied—and we cannot think of any good reason why it should not be under the facts in this case—then it was error to give an instruction setting out the terms of the foregoing statute, and the arguments of the state's counsel were based on false premises. Moreover, the main contention of the state in this connection appears to be that the nonfeasance, of which it complains, consisted of the omission of the defendant to provide medical care for the infant to be born. Such nonfeasance must, of course, have occurred prior to the birth of the child

and hence has no possible connection with section 58-101-supra, so that an instruction setting out that section was error again in the light of that theory.

## IV.   Failure to Provide Medical Care.

Pursuing the theory just mentioned further, the state contends that not alone was it an unlawful act to fail to provide medical (or perhaps other) care for the infant born, but that it was also criminal negligence within the meaning of section 9-205, supra. No case to sustain that contention is cited.

In the case of Regina v. Knights, 2 F. & F. 46, 175 English Reports (Full Reprint) 952, it was contended by the prosecutor Mills that if the jury thought the defendant knew she was about to be delivered, and that she wilfully abstained from taking necessary precautions to preserve the life of the child after its birth, and the child died in consequence of that criminal neglect, then the prisoner would be guilty of manslaughter. Chief Justice Cockburn remarked: "Have you any authority for that proposition? I never heard such a doctrine laid down before." The case as reported proceeds as follows:

"The Lord Chief Justice said, that he had consulted Williams, J., and that they were both of opinion that the prisoner could not, on this evidence, be guilty of manslaughter, according to the view propounded by the counsel for the prosecution."

In the case of Rex v. Izod, (1904), 20 Cox's Criminal Law Cases 690, the syllabus of the case is as follows: "To warrant the conviction of a woman for manslaughter of her new-born child, whose death was caused by want or proper care at birth, it is not enough to show that such woman was guilty of criminal negligence by purposely arranging to be unattended at her

confinement. She must also be proved to have been further guilty of negligence towards the child after it was completely born."

In 1 Russell on Crimes and Misdemeanors, 8th Ed., 635, the author states as follows: "The mere failure on the part of a woman to make proper provision for her expected confinement, resulting in the complete birth and subsequent death of a child, is not sufficient in itself to warrant a conviction of manslaughter. Where on an indictment of a woman for the murder of her infant it appeared that the infant was found dead in a bag and that the mother had not made any preparation for its birth, she was held not guilty of manslaughter, although she knew she was about to be delivered, and wilfully abstained from taking the necessary precautions to preserve the life of the child after its birth, and the child died in consequence of that neglect."

Quite a number of cases have been decided in this country on the killing of a new born child by an unmarried mother who was unattended at childbirth. And while the fact that no medical care has been provided might be a circumstance, along with others, that there existed an intention to kill (See State v. Stringer, 357 Mo. 978, 211 S.W. (2nd) 925), no case decided in this country has been found going to the length of the contention of the state. On the contrary in view of the numerous reversals of conviction in similar cases and the theory on which they are based would seem to suggest that the contention of the state would not be upheld. Children are born of unattended mothers on trains, in taxis, and in other out of the way places, and we fear to open up a field for unjust prosecutions of actually innocent women. We are not prepared at this time, at least, to lay down a rule contrary to the English authorities above cited.

We might incidentally say in that connection: Supposing that the State's contentions were correct, how would we be able to say that the defendant was convicted beyond a reasonable doubt in the face of the testimony that many infants born with pneumonia die and that with the degree of pneumonia with which the infant in question here was born, it *might* have survived with proper care? Does not such testimony engender considerable doubt as to what actually happened?

V. Sufficiency of Evidence of Live Birth.

The courts in England have struggled with the question such as before us for centuries. The author of an article in 20 Law Quarterly Review 134, 142, commenting on the undependable evidence obtainable when birth is given to a child secretly, stated: "Should the child soon die, someone (often it is not a medical man) must be present and observe both the birth and subsequent clear vital act; otherwise, there can be no reliable evidence of live-birth, for an expert can here certify few opinions." And the author states that out of fifty recorded charges during the preceding decade, acquittal of the charge of homicide most commonly resulted. On account of such difficulty of obtaining reliable evidence, England passed a statute making concealment of births a crime and making that a misdemeanor.

An annotation on the subject of infanticide is contained in 159 A.L.R. 523. It is there shown, that in order to convict of that crime, it is necessary for the state to prove beyond a reasonable doubt as part of the corpus delicti, first, that the infant was born alive, and second, if the infant was born alive that death was caused by the criminal agency of the accused. Counsel for defendant contends that neither of the requirements

have been met by the evidence in this case. We shall cursorily examine the first of these requirements.

It is stated in 2 Wharton's Criminal Evidence, 11th Ed., § 874: "In infanticide, an independent circulation and existence of the child must be shown; the fact of the child having breathed is not conclusive proof that it was born alive. Such independent circulation and existance may be present, even though it is still attached to its mother by the umbilical cord * * * *." See also Jackson v. Commonwealth, 265 Ky. 295, 96 S.W. (2d) 1014. The Court of Appeals of New York, as shown in People v. Hayner, 300 N.Y. 171, 90 N.E. (2d) 23, 25, in which there was evidence of a confession, gave little attention to the fact that the child had breathed saying in part: "The expansion of the lungs was of no great moment because the legal test of live birth—possession by the child of separate circulation—made irrelevant the question whether the child had breathed or not * * *. The testimony of their medical experts was necessarily of slight or merely conjectural significance. For here no one claiming to be an eye or ear witness came forth and, where that is the case evidence of live birth precedent to speedy death is of a nature practically impossible to medical science." We have not had any satisfactory answer to the question, either out of medical books or in the cases that have been considered by the courts, as to when an independent circulation exists. Dr. Stuckenhoff testified that for a while after the infant has left the body of the mother, there is a pulsation through the umbilical cord, and that the cord is usually not cut until such pulsation through it ceases. One accordingly would think that until such pulsation through the cord ceases, no independent circulation exists. And since the doctor was not able to tell when that happened, we seem to be in the same situation as the Court of Appeals of New York, completely unable

to tell whether there was a live birth. Before deciding this point however, we should prefer to have more light on the subject. The court in People v. Chavez, 77 Cal.-App. (2d) 621, 176 P. (2d) 92, took a somewhat different view saying that it should be held that a viable child in the process of being born is a human being within the meaning of the homicide statutes, whether or not the birth has been fully completed. The court admitted that it took a departure from the cases to the contrary and repudiated the common law rule that the presumption is that the child is born dead (See 20 L.Q.R. 146), but that the presumption is, according to experience, that the child is born alive. Whether or not that should be the presumption when it is shown that a child is born with acute pneumonia and that such children frequently die, is another question.

VI. Sufficiency of Evidence of the Fact of Killing.

However, let us not linger any longer in discussing the foregoing requirement. Let us assume that there was sufficient evidence to show that the infant in question here was born alive and pass to the question as to whether or not the evidence in this case shows beyond a reasonable doubt that the defendant was the criminal agency in killing the infant. In reading over the decisions on this point, one cannot help but feel that, for the most part, courts have been hesitant in applying Draconian laws; have felt that as much consideration is due to the party accused of infanticide as is due to a new born child whose very existence as a human being may be in the twilight zone; have applied the rule of reasonable doubt fairly strictly and many times have reversed convictions on account of indefiniteness and unreliability of the evidence produced by the state, even in cases in which there was testimony of a confession on the part of the accused. And since the case before us

is new in this jurisdiction, it may not be inappropriate to review some of the authorities on the subject.

In State v. Merrill, 72 W.Va. 500, 78 S.E. 699, 701, a case of infanticide, the infant was found buried under a stable in the back yard. The post mortem examination established that there were no marks of violence on the infant but a string was tied around the neck of the infant and the theory of the state was that the child died of suffocation or strangulation. There was, however, no testimony of the usual marks of strangulation. The supreme court reversed the conviction in that case stating in part: "But independently of any conflict in the evidence, the question going to the very foundation of the prosecution is, has the state established by *competent* proof the fact of the crime charged? After consideration of all the evidence and the authorities bearing on the subject we do not think it has done so. True many suspicious facts and circumstances are shown. But suspicion alone will not do. That the body of the little one was laid away as it was, is, under the facts and circumstances of its birth, reconcilable as well on the theory of innocence as of guilt of the accused, and so are most if not all other suspicious facts and circumstances. The books all say that before inquiry as to the guilty agent should be entered upon the fact that a crime has been committed should be established by proof." And the court, quoting from State v. Flanagan, 26 W.Va. 116, 123, stated further that: "'* * * the *corpus delicti* cannot be said to be proved until it be fully and satisfactorily proved that such death was not caused by natural causes, * * *.'" The court considered that to be the universal law. See also on that point State v. Voges, 197 Minn. 85, 266 N.W. 265, in which the court reversed a conviction for infanticide on account of indefinite proof.

In Sheppard v. The State, 17 Tex. App. 74, 82, it

appears that defendant gave birth to a fully developed child but buried the child secretly in a wooden box. The post mortem examination disclosed no violence upon the body of the infant. Although the doctors testified that the child breathed, the appellate court reversed the conviction stating as follows: "To say the least of it, the evidence that the child was born alive is susceptible of doubt. But concede this fact. Did its mother murder it? No violence is seen on the body of the child. The most inculpatory facts are that she concealed its birth, that it was found buried in an out of the way ravine, and that she left that section of the country, and perhaps denied her name when the officer went to arrest her. These, doubtless, are suspicious facts, but in the absence of any evidences of violence upon the dead body we do not think they are in themselves sufficient to establish the fact that she murdered her child."

In Fletcher v. State, Texas, 68 S.W. 173, the facts and opinion are in part as follows: "It may be conceded that the testimony sufficiently shows the child was born alive, but it fails to show with that degree of certainty which our law requires, that it came to its death by any criminal means or agency used by appellant. Before a conviction could be permitted to stand, this fact must be shown. No one was immediately present at the birth of the child, which occurred in the yard at night; and the only evidence that shows it was born alive is that of the sister of appellant, who was in the house, stating that she heard a noise out in the yard, and that she heard a cry, as of an infant; that she heard this noise three times, each time growing fainter. The child was found concealed in a gully, where appellant had placed it, several days after the night of its birth. No marks of violence were found on it. One of the physicians says, if it had been choked to death, evidently its neck would have shown it. All of the physicians agree in stating

that the child was not a regular nine-months child, and they state that it appeared to about an eightmonths child. It is shown that when the child was discovered the umbilical cord had been severed, and not tied, and it is shown that in this condition the child would very probably bleed to death. They testified that the evidence indicated the child was likely born alive, but, as shown, none of them state any marks of violence. According to their testimony, the most reasonable theory is that the child, which was evidently prematurely born, if born alive, may have died shortly after its delivery from natural causes, or have bled to death from the ignorance of the mother in failing to tie up the umbilical cord, or from her inability or negligence in doing so in time to prevent its bleeding to death. The action of the mother in concealing the body of the child, and in making false statements in regard to it, may be considered a suspicious circumstance against her; but even this is accounted for in her effort to conceal her disgrace. At any rate, under the authorities, we do not consider the evidence that appellant killed the child proven with that degree of certainty to authorize this verdict to stand."

In Taylor v. State, 108 Miss. 18, 66 So. 321, the daughter of the defendant gave birth to a child. When the doctor was called to attend the daughter, he thought he heard a cry of a baby but defendant stated there was no baby in the house and that the noise was probably made by a cat or dog. But the doctor finally found the child between the mattresses of the bed. A post mortem examination was made and the child was found to be fully developed. Its lungs were placed in water and floated. No marks of violence were on the body. The doctor testified that the death was probably due to suffocation. There was no direct evidence connecting the defendant with the death of the infant. Reversing

a conviction in the case, the court stated as follows: "The evidence in this cause is wholly insufficient to support the verdict. At most, the testimony of the physicians who testified on behalf of the state discloses that the child was probably born alive, and that in their opinion, if born alive, it died from suffocation brought about in some unknown way. The examination of the body of the child by these physicians failed to disclose any evidence of violence to its person, and their opinion that it died from suffocation seems to be based upon the fact that their examination also failed to disclose any reason why the child should have died from a natural cause."

In Brown v. State, 95 Miss. 670, 49 So. 146, 147, it appears that defendant gave birth to a child in a toilet on the train. She called her father, who was accompanying her, when she found she was going to give birth to a child and an old Negro woman was sent to her. It was afterwards discovered that defendant had given birth to a child of normal size which had dropped to the ground through the stool and was discovered dead near the track. A witness testified that he heard the child cry. Defendant claimed that she did not realize what was going to happen to her, and that after she discovered she could not prevent its falling through to the ground. The theory of the state was that the child had been thrown through the stool by the mother but there was no direct evidence to prove that theory. The court reversed the conviction and stated as follows: "Revolting as is the occurrence which is shown by the record in this case, we think the testimony utterly fails to show that the appellant was guilty of any crime under the law."

The case of Singleton v. State, (1948), 33 Ala. 536, 35 So. (2d) 375, 380, 381, bears a singular resemblance to the case at bar. The body of the infant was disposed

of in a manner similar to that in the case at bar, and the mother made denials similar to those made by the defendant here. The court found there was sufficient evidence to show that the infant was born alive, but reversed a conviction on the ground of insufficient evidence that she killed the child. The court held that the defendant may have been guilty of nonfeasance, but that there was not sufficient evidence to warrant a conviction. After stating the rule of caring for children ordinarily, the court said: "Cases enunciating the above principles have chiefly arisen where the parent has failed to secure medical aid for a sick child, or has permitted such child to die from starvation, or exposure. Pallis v. State, 123 Ala. 12, 26 So. 339, 82 Am.St. Rep. 106; 40 C.J.S., Homicide, § 63.

"Our research has however not uncovered any case where a court has been willing to hold that nonfeasance of a mother in the throes of childbirth or its immediate aftermath, resulting in death to the new born babe, should be considered of sufficient criminality to sustain a homicide conviction growing out of the death of the child.

"Clearly there is a vast difference between the studied non-feasance of a parent failing to call medical aid for a sick child, and the non-feasance present in omissions by an unattended mother beset with the pangs and travail of childbirth. The possibility and probability that maternal non-feasance under the latter conditions springs from ignorance, pain, or physical incapacity is too great to permit the inference of constructive criminal intent.

"The rigid requirements of the earlier cases as to proof of the viability of the child we think represent a groping recognition of the dangers inherent in a non-liberal approach to the doubtful question of the mother's criminality in such cases. Tables of infant

mortality during birth bespeak the natural dangers accompanying and besetting the delivery of a child even when attended by skilled obstetricians and under the most favorable conditions." After citing and stating the facts in another case, the court said further:

"The underlined portion of the above quoted opinion, although dictum, clearly reflects that this court is unwilling to attach criminality to non-feasant acts of a mother resulting during the travail of childbirth even though such non action result in the death of the baby. Particularly is such view correct where, as in this case the mother is ignorant, uneducated, and unattended." See also 20 L.Q.R. 148; Fletcher v. State, supra. We do not mean to say that the rule of the foregoing case is applicable in all cases uniformly. But in this case, the infant in question was the first child to which defendant had given birth. There is no evidence that she could have done anything different from what she did, or that she did anything different than her testimony shows. We can see no reason in this case why we should not apply the rule of the foregoing case herein in so far as applicable.

In the case of State v. Johnson, 95 Utah 572, 83 P. (2d) 1010, 1017, it appears appellant gave birth to a baby boy. She was unattended although her mother slept in the same room and her brother in an adjoining room. Appellant had not told her mother of her condition and did not call her mother when she became ill. She stated that the baby cried a little; that she was in great pain and swooned; that she was unconscious for an hour or more; that when she regained consciousness she felt for the baby; that it lay in the bed just where it was born with a part of the placenta attached; that she put her hand over its mouth to see if it was breathing and then put her hand over its heart but could not feel any heartbeat; that she left the baby under the

covers until the next evening when she carried it in a pasteboard box to a public toilet in the park and there deposited it. There was testimony that she confessed killing the child. The physician who performed the post mortem examination testified that no external violence was found so that it was evidently some internal force that had killed the child; that something came up in the course of the baby's life that caused its manual organs to cease to function as they should; that the lungs had functioned; that the baby had breathed; that circulation had been maintained for a certain length of time; that certain signs and appearances on the body indicated death took place. And then the doctor stated that in his opinion, the child died of asphyxiation. The majority of the court reversing conviction in that case stated as follows:

"The doctor stated that he saw no indicia, external or internal, as to the cause of death, and therefore since he found no reason for ascribing death to any other cause concluded that asphyxiation was the cause of death—not from any evidence of such as the cause of death but from the process of having eliminated other causes that occurred to him as possible. Such evidence not only fails to prove or to suggest or indicate an unlawful or unnatural death but if it even indicates anything, it tends to show a lawful or natural death."

Additional testimony of Dr. Russum which seems to be crucial testimony in this case is here set out verbatim, as heretofore mentioned as follows:

"Q. From your examination, and in your opinion, was the baby, the specimens of which you have examined and have related to the Court, born alive?

A. I believe this baby breathed, took air into the lungs; that it had pneumonia, that that started

before birth, and then it developed diffuse hemorrhages in both lungs, and that proceeded to the point where it could no longer breathe and it died then.

Q. In your professional opinion, doctor, and from your examination what would you place as the cause of death?

A. Pneumonia and diffuse hemorrage *causing asphyxia.* A combination of the two, I believe, would be the cause. (Italics supplied.)

Q. Well, I believe your testimony is that the lungs showed evidence of diffuse or unusual hemorrage.

A. That's right.

Q. What was the cause of these hemorrages of the lung and of the liver and esophagus?

A. Some process which damaged the capillaries, the little tiny vessels of the lungs, which caused them to ooze and bleed. *That could result from pneumonia;* it could result from asphyxia, and a combination of the two. (Italics supplied.)

Q. Would you say that such a baby would have a chance of survival?

A. Well, no. At what stage are we going to put it?

Q. At the stage that this baby had at birth as far as you can determine from your examination?

A. Well, you see, my examination was upon the lungs which were diffusely infiltrated with hemorrage, and, of course, at that stage the baby had no chance of survival.

Q. From your examination, could you determine how long an interval had elapsed from the birth of this baby—that is, from delivery of this baby —until its death?

A. That is an interval that would be minutes to hours, I would say, and I don't know how one would say absolutely.

Q. But it would not be over a matter of hours?
A. I would not think so.

Q. And it might be a matter of minutes?
A. It might be a matter of minutes with diffuse hemorrage."

With this testimony before us, the question for solution seems to have been considerably clarified. The hemorrage mentioned in the foregoing testimony was hemorrage of the lungs.

Dr. Stuckenhoff testified that pneumonia and asphyxia were the cause of death. Dr. Russum testified that pneumonia and hemorrage of the lungs *causing asphyxia* brought about the death. Both agreed that pneumonia and asphyxia were instrumental, and on a casual reading, one might consider the testimony of the same effect. But that is not true. The testimony of Dr. Russum is much more specific, in that he stated that pneumonia plus hemorrage were the causes of asphyxia —that is to say death—while Dr. Stuckenhoff did not mention hemorrage in that connection and did not know what produced the asphyxia. So we have here before us positive and apparently undisputed testimony that the infant died of pneumonia and hemorrage; that it was not able to survive and that it died within a matter of minutes after birth. The death then, taking the testimony at its face value, was due apparently to natural causes, and it is crystal clear that the defendant could not be convicted of infanticide, unless perchance it were shown beyond a reasonable doubt that these apparently natural causes were brought about by the criminal agency of the defendant. In view of the fact that the testimony shows that many children are born

with pneumonia, it cannot well be, and we suppose it is not, contended that this ailment was due to the defendant's criminal agency. Was the hemorrage due to the defendant's acts? That seems to be the vital question in this case. Here again we have only the testimony of Dr. Russum. He testified that this hemorrage could be caused by the pneumonia. If it was, then since the infant was born with pneumonia, hemorrage, too would seem to be a natural cause. So if pneumonia was the cause of the hemorrage, the defendant would, of course, not be guilty of homicide. Dr. Russum, as already stated, did not go that far. He merely stated that the hemorrage *could* be caused by pneumonia; that it could also be caused by asphyxia or a combination of both. So the testimony substantially means that it was as likely that the hemorrage was caused by pneumonia as by asphyxia. Here the likelihood was in the balance. The testimony is, accordingly, entirely as consistent with innocence as it is with guilt, assuming for the moment that if the cause were asphyxia, that might indicate guilt. In such cases the courts have uniformly applied the well known rule that if the evidence is as consistent with innocence as with guilt, it is insufficient to sustain a conviction, since in such case there cannot be a moral certainty of guilt and the rule of reasonable doubt has not been met. 2 Wharton's Criminal Evidence, 11th Ed., p. 1533; Underhill's Criminal Evidence, 4th Ed., § 18; 23 C.J.S. 161, note, also page 851; Scoggins v. United States (C.C.A. 8th) 255 F. 825, 3 A.L.R. 1093; Edwards v. United States (C.C.A. 8th) 7 F. (2d) 357; Ezzard v. United States (C.C.A. 8th) 7 F. (2d) 808; Wiener v. United States (C.C.A. 3rd) 282 F. 799. In Wright v. United States, (C.C.A. 8th) 227 F. 855, 857, the court, citing numerous cases, stated: "The burden was upon the government to make this proof, and evidence that is as consistent with innocence as with guilt is insufficient to sustain a conviction. Unless there is a substantial evi-

dence of facts which exclude every other hypothesis but that of guilt, it is the duty of the trial court to instruct the jury to return a verdict for the accused; and where all the substantial evidence is as consistent with innocence as with guilt, it is the duty of the appellate court to reverse a judgment of conviction." See also Smith v. State, 40 Wyo. 128, 274 P. 1074. It is accordingly quite clear that if we accept the testimony of Dr. Russum, as apparently we must, the conviction herein cannot stand. Here we have a simple and not unreasonable explanation of the infant's death—as the result of pneumonia and hemorrage induced by pneumonia, both natural causes in such case—and since it was incumbent on the state, as held in cases already cited, to show that the death was not due to natural causes, it would seem to follow that it was incumbent on the state not only to show the incorrectness of the testimony of Dr. Russum, but also to show that the hemorrage was not due to pneumonia but was due to asphyxia and that the latter was due to the criminal agency of the defendant. We do not think that the state has done so.

Dr. Stuckenhoff did not contradict the testimony of Dr. Russum, at least directly, although we are uncertain what to make of his testimony that the pneumonia was not severe enough to cause asphyxia. He did not mention hemorrage in that connection. It may be that he was not considering that the pneumonia was acute. He testified that a pathologist, as is Dr. Russum, is called upon in a case of this kind to make a more accurate and microscopic examination of the cause of death in order, as he expressed it, to coordinate the gross examination with the microscopic one. So we take it that Dr. Stuckenhoff would not dispute the findings of the microscopic examination of Dr. Russum that the pneumonia in this case was acute and could produce the hemorrage mentioned, or it is at least doubtful that he would dispute

them. If that is correct, then the conclusion heretofere stated is correct, absolving the defendant.

Let us, however, examine the remaining testimony more in detail. While Dr. Stuckenhoff stated that the death of the infant was due to asphyxia and pneumonia with which the infant was born, he also stated definitely that he did not know what caused the asphyxia. That, perhaps, is not surprising. He testified that the first few minutes after birth are the most critical in the life of an infant. Some unknown factors may have entered during the travail of the mother at the infant's birth of which the doctor, not being present, could have no knowledge. Nor shall we enter into any conjecture as to what those unknown factors may have been. Neither Dr. Stuckenhoff nor Dr. Russum stated that human criminal agency is a sine qua non of the existance of asphyxia. For aught we know, or the evidence shows, there may be other natural causes to produce it aside from pneumonia. Dr. Russum testified there are three classes of asphyxia, (1) antenatal, (2) that which occurs during birth and (3) that which occurs after birth. We find it stated in Bedford's Principles of Practice of Obstetrics, page 369, that asphyxia may be treated medically. Dr. Russum did not testify that if antenatal asphyxia, or asphyxia during birth, occurred, the infant would necessarily be stillborn and so unable to breathe. It is conceivable, theoretically at least, that there are degrees of asphyxiation—shutting off or impeding the oxygen—just as pneumonia may be severe or acute and that in such case the child might breathe for a period of time, however slight, notwithstanding the existence of asphyxiation. We find it stated in the Encyclopedia Americana under "asphyxia" that the symptoms of asphyxia may be developed rapidly or slowly. If what we have said is so and the asphyxia was antenatal or occurred during birth then, of course, it

has not been shown that asphyxia, if that was the cause of death, was due to the criminal agency of the defendant. However, on account of the meager testimony on this point, we are here in a field of conjecture and shall not pursue the point further.

Dr. Stuckenhoff enumerated several factors, among others not enumerated, that might produce asphyxia. He stated that asphyxia could be caused by mucus, presumably by the mucus with which the infant was born. The defendant testified that she wiped the mucus from the infant's mouth so that it could breathe. That seems to be somewhat corroborated by the testimony of Dr. Thaler. If, however, what she said is not true, the defendant cannot be held responsible for nonfeasance if the rule of Singleton v. State, supra, is applied. Dr. Stuckenhoff, as well as Dr. Russum, testified that the asphyxia could be caused by drowning. But there is no evidence of that. There is no testimony in the record that there was sufficient water or any water in the toilet to drown the infant. Dr. Stuckenhoff testified that he found no water on the lungs and while he stated that water is not necessarily found in a person drowned, it is usual (Taylor's Medical Jurisprudence, p. 319, 320), and it is at least some indication that drowning did not take place. Jackson v. Commonwealth, 265 Ky. 295, 96 S.W. (2d) 1014, 1015. So the matter of drowning is wholly speculative. Speculation, suspicion, surmises, and guesses have no evidentiary value. 2 Wharton's Criminal Evidence, 11th Ed., § 971; Underhill's Criminal Evidence, 4th Ed., § 18; 23 C.J.S. § 1281, p. 850; 22 C.J.S., § 639, p. 979; Foster v. State, 180 Tenn. 164, 172 S.W. (2d) 1003. Numerous other authorities might be cited. Asphyxiation might take place by strangulation. But there is no evidence of that. The contrary may be inferred from the testimony of Dr. Stuckenhoff and Dr. Thaler when they stated that there was no trauma

of any kind found on the body of the infant. It is stated in 3 Wharton & Stille's Medical Jurisprudence 85 as follows: "If the strangulation is done with the hand, there are the marks of the finger nails on the neck, as described in the consideration of the external signs of suffocation. If the strangulation is done by a string, cord, apron string, stocking, or some other band (most frequently taken from the dress of the mother) there may be marks of the constricting band on the neck, as in the adult; but, as the skin of the infant is very delicate, the marks of excoriation would be more evident, though the force required to strangle the infant is only slight." No such marks as here mentioned were found on the infant.

Dr. Stuckenhoff further testified that asphyxiation could be caused by something over the nose and mouth so that the infant could not breathe. But there is no evidence of that. The matter is mentioned in 3 Wharton & Stille's Medical Jurisprudence 81, where the author says: "Perhaps the most usual way for the mother to suffocate the child is to cover the nose and mouth with her hand in her attempt to keep it from crying and so betraying its birth. If the woman succeeds in stopping the cries, she also kills the child. In these cases the signs of the method used are often distinct. There are the marks of the finger nails of the mother on the face of the child, around the nose and cheeks. These lacerations of the skin are especially likely to occur, as the skin of the child is so slippery from the vernix caseosa, and it is necessary to hold the child fast for five or six minutes to end its attempts at respiration. These superficial lacerations are rarely associated with ecchymosis, and are to be distinguished from accidental excoriations occuring after death by their characteristic size and peculiar angular form as well as by their location around the mouth, nose and neck. Sometimes the head

is held in one hand by the occiput, and the other hand used to cover the nose and mouth. Then there would also be nail marks behind the ears as well as on the face. Owing to the difficulty of holding the child's head, it is not infrequent to have the suffocation supplemented by strangulation, the mother's hand readily grasping the neck of the infant. Here the nail marks are found also on the neck." And the authors further say on page 85: "The evidence, then, of death from suffocation, must rest upon the external signs in addition to these subpleural ecchymoses as the conservative proof of the crime." There is no testimony in accordance with the statements of these authors, so that the matter of suffocation is clearly speculative.

In all the various and numerous attempts which we have made to find a sound basis to uphold the conviction herein, we have everywhere, except as heretofore pointed out, been met by surmises and conjectures and possibilities. The state cites us to People v. Chavez, 77 Cal.App. (2d) 621, 176 P. (2d) 92, as indicating that the testimony herein was sufficient to show the criminal agency of defendant in the infant's death. The physician in that case testified positively that the infant's death in that case was caused either by suffocation or hemorrage from the untied umbilical cord and gave substantial reasons for that opinion. No such definite evidence for conviction was given in this case. Dr. Russum's testimony, however, is similar, except that he testified that one of the alternatives was wholly consistant with the innocence of the defendant as already heretofore shown. In Denham v. Commonwealth, 239 Ky. 771, 40 S.W. (2d) 384, a physician testified that it would have been possible for the infant there involved to have died from suffocation. That evidence was deemed insufficient for conviction. In Josef v. State, 34 Tex.Cr.R. 446, 30 S.W. 1067, a physician testified that

a cord was tightly drawn around the neck of the infant and that the cord might have produced strangulation. The evidence was held insufficient to convict. It is stated in 23 C.J.S. § 1281, p. 850: "The jury should be charged that it is not sufficient for a conviction that the evidence establishes strong suspicion or a probability of the guilt." In State v. Walser, 318 Mo. 853, 1 S.W. (2d) 147, 151, the following instruction was held to state a correct rule of law, namely: " 'And you are further instructed that it is not enough that the evidence in the case goes to show his guilt, but such evidence must be entirely inconsistent with a reasonable supposition of innocence. Suspicions, however strong, or probabilities, however great, will not be sufficient to justify a conviction, but the evidence, to justify a conviction must be positive, convincing, establishing the defendant guilty of the charge contained in the indictment beyond a reasonable doubt, and unless the evidence so convinces you ,a verdict of not guilty must be returned.' " It is readily seen that such an instruction would have been highly and peculiarly appropriate in a case such as that at bar and might have tipped the scales in favor of the defendant with the jury.

Assuming that the jury had the right to disregard the testimony of defendant—testimony which shows her to be guiltless—that does not aid the state, for, upon it was the burden to show facts proving the defendant guilty beyond a reasonable doubt. The fact that the defendant concealed the birth of the infant and carried it out on the highway—gruesome as that was—are, of course, facts and circumstances which ordinarily would aid in showing her guilt but are of no weight in view of the testimony of Dr. Russum, and moreover, must be considered in the light of the shame which defendant naturally felt, as mentioned in some of the cases already cited. And yet that gruesome fact

mentioned undoubtedly contributed considerably to the verdict which the jury returned. No matter what the defendant's intention may have been, she cannot be held guilty unless she actually killed the infant. If a man goes down the street to kill another, he cannot be found guilty of homicide unless he carries out his intention. That applies here. That the defendant was guilty beyond a reasonable doubt is not confirmed by the evidence. That, in the nature of things, cannot be surprising in a case such as before us, as noted in cases already cited. Considering the testimony as a whole, it would seem that we are forced to the conclusion that either the infant died of natural causes, or at least, that the testimony fails to show the contrary. In view of that fact, aside from other errors heretofore pointed out, we see no escape for us other than to set the conviction and judgment aside, and it is so ordered. The case is accordingly remanded to the district court for such further proceedings as, in the light of this opinion, may be deemed necessary and advisable.

*Reversed and remanded.*

RINER, J., and HARNSBERGER, J., concur.