FOSTER *v.* STATE.

(*Knoxville*, September Term, 1942.)

Opinion filed July 3, 1943.

Ross & Ross, of Savannah, for plaintiff in error.

ERNEST F. SMITH, Assistant Attorney-General, for the State.

MR. JUSTICE GAILOR delivered the opinion of the Court.

At the December, 1942 term of the Circuit Court of Wayne County, the plaintiff in error, who will be referred to in this opinion as defendant, was convicted of murder in the first degree and his punishment fixed at 30 years in the penitentiary. A motion for a new trial was seasonably made and overruled. Judgment was entered on the

verdict and from the judgment an appeal to this court was prayed, granted and perfected.

It appears from the record that at the term of the Circuit Court of Wayne County in March, 1941, the defendant was indicted for the murder of three people, J. Frank Wilson, his wife, Mrs. Wilson, and her sister-in-law, Mrs. Sarah Berry. At the same term defendant was also indicted for arson. At the term of said court held in April, 1942, defendant was put upon his trial for the murder of J. Frank Wilson, only, found guilty, and his punishment fixed at 20 years in the penitentiary. A motion for new trial was granted by the Honorable W. B. Turner, the judge before whom the first trial was held, and by whom, on account of defendant's poverty, attorneys had been appointed for his representation.

The second trial was held before the Honorable Joe M. Ingram, Judge, who appointed new attorneys to represent the defendant and protect his interest. These attorneys represented him at his second trial in the circuit court before Judge Ingram, have perfected this appeal, and now represent him before this court.

The record is quite long, and we think it is sufficient to restate only the following facts to dispose of the appeal.

The defendant, Foster, is a small man, weighing only 86 pounds. He is 64 years old, and incapacitated for any strenuous manual labor, on account of a shoulder injury which he sustained in his youth. The deceased, J. Frank Wilson, was 74 years old and very active and independent. Wilson did such heavy labor as was to be done on his farm, while defendant cooked and did the housework. The salient evidence to establish the manner of the commission of the crime alleged and the identity of

the victims, as well as the criminal, is that on the night of November 24, 1940, the only two male occupants of Wilson's house were Wilson and the defendant. During that night, or early the following morning, the house caught fire and burned to the ground. The cause of the fire is unknown, and no evidence is introduced or suggestion made of the manner of its starting.

After the fire, in the ashes in the bedroom, which Wilson had occupied, were found the incinerated bodies of three human beings. It is testified that Wilson, his wife, and her sister-in-law, Mrs. Berry, had all intended to sleep in that room on that night. Beside and upon the body with the largest thigh bones were found a pocket knife and metal overall buckles and buttons. No medical or expert testimony was introduced by the State, although a Dr. Wood who is now in the military service, had examined the remains of the bodies on the morning of the fire and an undertaker from Waynesboro had collected and prepared them for burial. From the size of the bones lying before the fireplace and the fact that the knife, metal overall buckles and buttons were found near these bones, it is inferred that these bones were those of the man Wilson, although no witness absolutely identified them as such. There was some testimony that Wilson had owned a knife similar to that found, and was clad in overalls the day before the fire.

The legs of this male body were completely destroyed by fire. The torso was half consumed, leaving only the charred viscera and large bones of the pelvic region and upper leg for identification as the remains of a man's body.

The skull of this body was not intact. Burned fragments of some substance, which a lay witness imagined

were fragments of skull, were found in an area of 18 or 20 inches about the upper part of the torso. These fragments were so burned that it was necessary to use great care in gathering them for burial. However, no exception was taken to their identification by a lay witness as the remains of the bones of the head and skull.

No attempt was made by any witness to identify the remains of the male body as characteristic of the physical aspect of Wilson in life. Whereas, the remains of the body of Mrs. Wilson were identified as being hers on account of the length of the body above the waist.

Much emphasis is laid upon a snuff box found by the bones of one of the women, and the knife and metal buckles and buttons to show that the occupants of the room had not removed their clothes or gone to sleep when the fire started.

The fire blackened head of a sledge hammer was introduced in evidence. One witness testified that he had found the sledge hammer in the ashes of the fireplace about a month after the fire, although two witnesses testified that between the time of the fire and the time the hammer was said to have been found, they had examined the ashes in the fireplace and there was no such article there at the times of their separate examinations. The witness who found the hammer also testified that it was Wilson's hammer and that he usually kept it on the back porch. The defendant denied that he had ever seen the hammer. There was no testimony to show any connection of the defendant with the sledge hammer, or that he was physically strong enough to use it or that he knew the hammer was on the place.

The room in which the three bodies were found was at the front of the house. The defendant occupied a room

adjoining it at the rear. There was a locked door which opened into the Wilsons' room between their room and that of the defendant. It is also suggested there was a way to reach the Wilsons' room from the defendant's room by going up the stairs through the attic, and descending stairs which led into the Wilsons' room.

The motive for the murders as being robbery is supplied by circumstantial evidence that prior to the fire the defendant had no money and had worked for Wilson for more than a year for bed, board and clothing, whereas, shortly after the fire he bought, for cash, articles of clothing, a second-hand wagon and a small amount of roofing. There was also the testimony of one witness, that at some uncertain time before the fire, the defendant offered the witness $5 if he would lend defendant his shotgun and one shell, ''so that he could get old man Wilson's money.'' This witness was so thoroughly impeached by cross-examination and other discrepancies in his testimony that we consider this story worthy of no consideration or belief whatever. The witness admitted that he had been offered money to tell this story on the stand.

It was developed that up to about two years before the fire, the Wilsons had been country merchants in a small way of business; that Mrs. Wilson tended the store and handled the money; that about two years before the fire she had become a bedridden invalid. At the time of the fire the store had been closed and what remained of the stock removed to a closet in the bedroom where the bodies were found. Such cash as was on hand was also kept in the same closet which was locked.

It appears from the testimony of the defendant, as well as from that of a disinterested witness, that within

a year before this fire, after the defendant was living at the home of the Wilsons, and in the same room where the bodies were found, another fire had started in the night by a log rolling out from the fireplace and burning such a large hole in the floor that the flooring had to be replaced by Wilson in an area about four feet square.

A reputable physician testified that Mrs. Wilson had given him a check for $12.50 for medical treatment on the Friday night before the fire, and another witness testified that he had been given a blank check to buy some supplies in Waynesboro on the same day. From these last facts, it is insisted that the Wilsons had little or no cash on hand at the time of the fire.

There is nothing in the record to show that the defendant's character was such that he would commit murder for money. From the record he appears to be a simple-minded little wanderer, with few needs and no ambition. Earlier in his life, he and one of his brothers paid $2,000 on a farm in Arkansas, and after a year when farming was hard, they took their loss on the farm and defendant went into the restaurant business in Osceola, with the same lack of success and the same seeming indifference to profit. He then drifted into Alabama, living at various places, and doing light work on account of his small size and physical weakness: He worked for little more than his board and keep.

It seems to have been his habit, whenever he got any money, to put it in a can or tobacco sack and bury it in the ground. While he was in jail at Waynesboro, after his arrest and before his first trial, an attempt was made to make him disclose the whereabouts of his buried treasure. It was forcibly represented to him by the authorities that if he would lead them to the place where the

money was buried, they would use this money to make his bond and secure his release from confinement. On this assurance he did take them where a small amount of money was buried in a tobacco sack, but there was nothing to connect the buried money with any money that the Wilsons may have had, except that certain of the coins found bore a date later than that of the time defendant said he had buried the money.

It is noteworthy that no suspicion attached whatever to defendant for some time after the fire. The undisputed evidence is that he was quite sick at his stomach and frequently vomited during the night of the fire and throughout the next day. The fact that he did not attend the funeral under these circumstances does not strike us as suspicious. Neither did several of the neighbors who testified and who were busy with affairs about their farms at the time of the funeral. For a week or more after the fire the defendant was at liberty and slept in the homes of several of the neighbors. He made no effort whatever, to leave the neighborhood or to escape, and showed no indication whatever that he was under any strain more than was normal on account of his physical condition after the fire.

This is a summation of the evidence upon which the conviction was had.

The defendant's attorneys have filed 20 assignments of error. To dispose of this appeal we feel that it is necessary to consider only the first three of these assignments, and we may conveniently consider them together. They are:

1. "The evidence preponderates in favor of the innocence of the defendant, and against the verdict of guilty found by the jury;"

2. "Because there is no evidence to support the verdict of the jury, in that there is (1) no evidence of the *corpus delicti,* and (2) reliance by the State for the conviction was wholly upon circumstantial evidence, and no circumstances were proved to show or *att*end to show the guilt of the defendant;"

3. "Because the defendant was on trial in this case for the murder of J. Frank Wilson, and there was no fact or circumstance in proof to show that the said J. Frank Wilson was murdered or unlawfully killed, and there was no proof, circumstance or otherwise, of the *corpus delicti.*"

The argument on the first assignment of error goes farther than the actual assignment and insists that this court should examine all the evidence introduced, and itself determine that under the evidence, every other reasonable hypothesis is excluded except the guilt of the defendant. It is so insisted that this court substitute its judgment for that of the jury and the trial court. We feel that this is, in effect, an insistence for a trial "*de novo,*" and this the defendant can not have in this court, where the jurisdiction is appellate only. *In re Bowers,* 137 Tenn., 193, 192 S. W., 919; *Memphis St. R. Co.* v. *Byrne,* 119 Tenn., 278, at page 320, 104 S. W., 460; *State* v. *Gannaway,* 84 Tenn., 124.

We think that the rule is the same whether the verdict below be based entirely upon circumstantial evidence or not, the defendant comes into this court under a presumption of guilt. *Blackwell* v. *State,* 153 Tenn., 319, 283 S. W., 986.

To establish the *corpus delicti* it must be shown beyond a reasonable doubt that J. Frank Wilson was murdered as found in the indictment. There is perhaps

substantial circumstantial evidence to show that the re-mains of the man's body found in the burned room was that of J. Frank Wilson, though the identification is entirely inferential.

If we admit without question or scrutiny all the evidence the State has introduced, there are only these facts to show that Wilson came to his death by unlawful means: (1) The skull of the body was not intact, and fragments of bone were scattered about the place where the head of the body should have been. (2) A sledge hammer head was found in the fireplace a month after the accident. (3) A man's body clad in overalls was lying on the floor in front of the fireplace when the fire started. The man was already dead since he made no attempt to escape the fire, and therefore did not burn to death.

From these proven facts it is deduced that Wilson was murdered with the sledge hammer, and the proven fact that his overall buttons and the metal articles in his pocket were found by his body are presumed to show that the murder took place before he had removed his clothes and before the fire started.

If the State's theory is true, this small defendant, who weighs only 86 pounds and who has a broken shoulder and is incapable of strenuous labor, took a sledge hammer, broke open a locked door and killed three people, who, so far as the evidence shows, offered no resistance, although they were fully clothed and awake at the time. It is in evidence that Wilson, not the defendant, performed the heavier labor about the farm, while defendant cooked and did the housework. Wilson was very active and independent for his age, according to his son's testimony. It is true that Mrs. Wilson was an invalid, but there is nothing to show that her sister-in-law, Mrs. Berry, was

not active and able for a woman of about 60 years of age. She was in sound health and in the house to nurse and look after Mrs. Wilson. The sledge hammer head was not found in the ashes of the fireplace until a month after the accident. Several witnesses, during that month, examined the ashes separately and denied that any such article was in the ashes at the time of their examination. The hammer was identified as being the property of Wilson, but there is no evidence, whatever, to show that the defendant had ever seen or used the hammer. It is not shown that defendant was physically able to use it. In our opinion, there is insufficient evidence to show that Wilson, admitting that it was Wilson's body that was found, came to his death by unlawful means.

Although we recognize that the *corpus delicti* may be established by circumstantial evidence only (*Thompson* v. *State,* 171 Tenn., 156, 101 S. W. (2d), 467), we think it is obvious that in this case, to sustain the theory of the State and establish the indispensible elements of the "*corpus delicti,*" that inference must be drawn from presumption and presumption based on presumption. This may not be done, *Railroad Co.* v. *Lindamood,* 111 Tenn., 457, 78 S. W., 99.

No inference can be made from circumstances until the *corpus delicti* has been proven beyond a reasonable doubt. *Tyner* v. *State,* 24 Tenn., 383; *Carey* v. *State,* 26 Tenn., 499; *Youkins* v. *State,* 42 Tenn., 219.

"In a homicide case, where the life or liberty of a citizen is at stake, and where the guilt of the accused must be established beyond a reasonable doubt, the causal connection between the death of the decedent and the unlawful acts of the respondent cannot be supported on mere conjecture and speculation." *State* v. *Rounds,* 104 Vt.,

442, 160 A., 249, 254, quoted with approval in *Rucker* v. *State*, 174 Tenn., 569, at page 573, 129 S. W. (2d), 208, at page 210.

 We feel that the State failed to establish by evidence having any probative value that defendant Foster murdered J. Frank Wilson. In fact, there is no evidence that Wilson was murdered. Though that explanation of the facts is probable, "the crime, as well as the criminal, must be shown." *Tyner* v. *State, supra.* In order to convict of crime it is necessary that the proof show both the *corpus delicti* and the criminal agency of the accused. *Lancaster* v. *State*, 91 Tenn., 267, 18 S. W. 777.

For the reasons stated, we sustain the first three assignments of error and reverse and remand the case.