STATE of Tennessee, Appellee,

v.

Joe SHEPHERD, Appellant.

Court of Criminal Appeals of Tennessee, at Knoxville.

Oct. 29, 1992.

Order on Petition to Rehear Nov. 24, 1992.

Permission to Appeal Denied March 22, 1993.

Charles M. Corn, Public Defender, Cleveland, for appellant.

Charles W. Burson, Atty. Gen. of Tennessee and Jeannie Kaess, Asst. Atty. Gen. of Tennessee, Nashville, Jerry N. Estes, Dist. Atty. Gen., Athens, for appellee.

## OPINION

TIPTON, Judge.

The defendant, Joe Shepherd, was convicted in the Monroe County Criminal Court of second degree murder and the jury imposed a ninety-nine-year sentence. In this appeal as of right, the defendant asserts the following:

(1) The evidence was insufficient to convict him of any degree of homicide.

(2) The trial court erred in refusing to suppress as evidence certain statements made by him to law enforcement officials.

(3) The trial court erred in refusing to excuse jurors for cause because of their knowledge and opinion of the defendant and this case.

(4) The trial court erred by allowing a witness to testify about the effects of a pill furnished by the defendant.

(5) The trial court erred in refusing to allow the defendant to cross-examine a witness about previous perjury.

(6) The state committed misconduct during final argument.

The defendant was charged in April, 1978, with the first degree murder of Kathy Clowers, a sixteen-year-old girl. She had been missing from late March, 1976, until April, 1978, when the defendant led police to the site of her burial. The defendant escaped from jail in July, 1978, but was arrested in November, 1988, in Canada after being identified from a broadcast about him on the "Unsolved Mysteries" television program. His trial occurred after his return from Canada.

At the trial, Joe Graves testified that he was a Monroe County deputy in 1978. He said that the defendant's girlfriend, Peggy Raper, and her mother came to talk to him about a missing girl. After further investigation, he talked to the defendant at the McMinn County jail. After the defendant talked to his father, he gave an oral statement to Graves on April 13, 1978, about which Graves made notes. The notes had the defendant saying the following:

> We was with a bunch of people partying above the bridge next to Farner. Kathy got some dope from them. We later came back to the Coker Creek beach and got some more dope from a bunch of people there. They were in a van and they were from Ohio, I think. Me and Kathy drove to the top of the Tellico Mountain at the end of the old abandoned 68, above Elbert Martin's, and parked, and we went to sleep. I slept until the next day or until the day after that. Kathy was dead. I took her to where I buried her and carried her and drug her up the branch.

Graves stated that the defendant led him, other officers and the district attorney general to the location of the burial and told them where to dig. The remains of a body were discovered. Graves described where various items of clothing were found around the body and stated that the Clowers family identified the clothing as belonging to Kathy Clowers.

Graves testified that he spoke to the defendant again on April 29, 1978, and obtained another oral statement which he wrote down. His notes reflected the defendant saying the following:

Me and Kathy went by Mickey Ellers and got some dope, blotter acid, tea, marijuana, then went to the self-service station in Tellico, and there we talked to Frankie Harris and Ricky Hooper. We was all going to a party out past Coker Creek. My car I left parked at Coker Creek. We was in Frankie's car, and we was at the hollow on the left after you go over the bridge and under the railroad, going up the hill to Farner in Polk County. I was drinking and using the paper acid. Everybody was taking it for at least an hour. We had a fire built and lanterns hung up. We left and went back to the roadside park at the Coker Creek beach and partied there while (check with Ronnie Walker) smoking and drinking. Billy Gentry had to go home. Kathy Clowers, Frankie Harris and Ricky Hooper stayed there. After I come back, they was partying, really freaking out. I left and went home. Frankie and Ricky come home the next day. Ricky had tore his transmission out. They said they'd took her to Woods Truckstop. I asked Ronnie Garrett about it a few days later and he said he hadn't seen them. Four days later we was coming back through where she was buried. They said, "Here's deadman's curve." The next day we went to check the grave to see if anyone had found it.

Graves testified that the deceased's birthday was July 17, 1959. He said the record reflected that she began missing on March 21, 1976, when she was sixteen years old.

Evidence was admitted regarding the defendant's escape from jail in 1978. He was apprehended near London, Canada, in 1988. In Canada, he had established a new identity as Joseph Tripp. The defendant was returned to Tennessee to stand trial.

The evidence reflected that the deceased came from an impoverished family and had learning disabilities. Her special education teacher testified that she had the mental capabilities of a much younger person. She said that the deceased was a loving, outgoing person who was not depressed and who never exhibited anything to indicate she was suicidal.

Billy Gentry, who was fourteen years old in March, 1976, testified and admitted having 1989 convictions for felonious possession of marijuana and cocaine. He stated that he knew the defendant and the deceased. The defendant was about twenty-one years old at the time. The defendant asked Gentry on two occasions if he knew any girls for the defendant to date and said that he did not want them to know that he was married.

Gentry testified that he had occasion in March, 1976, to ride with the defendant to take the deceased's brother home. The deceased was outside and the defendant asked Gentry if she was old enough to date. Gentry asked the deceased's brother, Jerry, who ran into the house and returned, saying she could go with them. Gentry stated that the deceased entered the back seat of the car, but the defendant would not let her brother go with them. The three of them left.

Gentry stated that they went to Madisonville, stopping at the skating rink and circling the A & W a couple of times. The defendant suggested that they drive into the mountains. On the way, the defendant bought some beer. Gentry did not see the defendant drink any, but he said that he and the deceased were drinking with the defendant opening most of the beer cans.

Gentry said that the defendant traveled Highway 68 to Coker Creek Mountain and parked about two hundred feet off the road near a railroad crossing. The defendant told Gentry to get into the back with the deceased, which he did. Gentry did not recall if the defendant stayed in the car. Gentry said that he and the victim talked, kissed a few times, and drank a couple of beers. He denied making any improper advances and said that the deceased was in a good spirit. After a while, Gentry got out of the car and the defendant got into the back with the deceased. Gentry testified that, after fifteen to twenty minutes, the deceased got out of the car crying and saying she wanted to go, but denying that the defendant hurt her.

Gentry stated that he told the defendant it was late and they should go home.

On the trip, Gentry saw a prescription bottle of pills which the defendant said to take to get a "good buzz," but nobody took one. Gentry said they bought some more beer which the deceased and he drank while the defendant drove around Madisonville. He said the defendant was still opening the beer cans.

Gentry stated that he was drunk when the defendant took him home after 1:00 a.m. He said he got very sick and passed out in the yard. He testified that the deceased was still with the defendant when they left his house. The deceased was drunk, but not sick.

Gentry stated that, approximately two weeks later, the deceased's father asked him if he had seen the deceased. He further testified that when he later asked the defendant about the deceased, the defendant told him that she got into a car with some boys at a truck stop and went to Florida. Gentry said that the previous night was the only time he was with the defendant and the deceased.

Upon cross-examination, Gentry said he was unsure if the defendant had previously known the deceased. He stated that the defendant did nothing violent during that night and did not force them to drink beer. Also, he said he did not see Ricky Hooper and Frankie Harris that night.

Mickie Eller testified that he sold drugs and admitted 1978 convictions for felonious drug sales and possession. In fact, he said he had sold drugs to two to three thousand people. He stated that he knew the defendant, Ricky Hooper, and Frankie Harris, but did not know Billy Gentry or the deceased. He said that the defendant had never been to his house and had never bought drugs from him. His testimony reflected strong dislike for the defendant.

Ronnie Walker testified and admitted to previous burglary and assault convictions. He stated that he knew the deceased and had seen her in the defendant's company on three occasions within a one to two week period. The first time was on the side of what was known as River Road. The defendant, the deceased and David Ware were in the defendant's car, pulled off the road in the daytime. Walker said they asked him for marijuana which he did not have. He said they were drinking beer, but he saw no pills. Walker talked with them for about ten minutes.

The second time was several days later in Tellico Plains at the mobile home of David Harris, Frankie Harris' brother. Present were the defendant, the deceased, David Harris and his wife, Ricky Hooper and a younger Harris brother. Walker said everyone was drinking and smoking marijuana, but he saw no pills. He said the defendant slapped the deceased once. Also, he stated that the defendant took the deceased into the bedroom.

The third time involved two occasions, one at Mickie Eller's house around dusk and the other near Coker Creek bridge later that evening. Walker said he went to Eller's to buy marijuana. He said there were fifteen to twenty people drinking and smoking marijuana around a bonfire. He stated that the defendant, the deceased, Frankie Harris and Ricky Hooper arrived in the defendant's car. He saw the defendant walk off with Eller. Walker stayed for thirty-five to forty minutes and he said that the defendant and the deceased were still there when he left.

Walker testified that the defendant and Frankie Harris told him that they were going to Coker Creek Bridge, close to Polk County. The area is sometimes called the Coker Creek beach and has picnic tables. Walker stated that he bought some beer and went to the area. He testified that the defendant, the deceased, Ricky Hooper, Frankie Harris and Harris' younger brother, Gary, were already there with a fire started. He said the only cars there were his and the defendant's. All were drinking beer, smoking marijuana and laughing. Walker said that either Ricky or Frankie mentioned that they had taken LSD.

Walker testified that the deceased was drinking beer and smoking marijuana, but he saw no pills. He said the deceased was partying with the others and it was obvious that she was there with the defendant.

Walker stayed there partying for two to three hours. He said that the Coker Creek area was well known as a place to go party.

The defendant's former girlfriend, Peggy Raper Stanley, testified. At the age of fifteen, she killed her father who had been abusing her. She stated that she met the defendant in late 1975 or early 1976 at the skating rink and dated him until 1978, having two children by him. She testified that on the night they met, the defendant told her that he knew about or had seen, she did not remember which, some boys mistreating a girl and that they had "O.D.'d her" and she had died. He said they buried her. She stated that the defendant said that the girl had been on drugs and that they had given her more. She said she did not, at the time, think much more about what he said.

Ms. Stanley testified that on many occasions the defendant drove by or stopped at the location where the deceased was ultimately found. She asked him why they stopped there so often and he replied that he had some marijuana plants. However, Ms. Stanley said he never smoked marijuana with her. She said that the defendant would take little white pills when he was upset.

Ann Barnett, Ms. Stanley's older sister, testified and admitted that she had been convicted of burglary in 1979. She stated that she had gone out with the defendant once, apparently in 1976. She said she was experimenting with drugs at the time and that the defendant said he had some nerve pills at home. They got the pills and each took one. She said it "paralyzed" her for three days and that her mother had to do everything for her during that time.

Ms. Barnett testified that she was driving the defendant's car and that the defendant was real nervous that day. She said that he stated that he knew where a girl was buried, that he had killed her, and that he needed to get his pills or he was going crazy. On cross-examination, Ms. Barnett testified that her sister, Ms. Stanley, was in the car when the defendant made the statement. She said when he took the pill, he got better. She indicated that the first time she told the police about the statement was in 1990. Also, she admitted that the defendant took

her home and told her mother to look after her because she had taken a high powered nerve pill.

Richard Fisher, the former attorney general for the district, testified about finding the deceased's skeletal remains buried at the location where the defendant had led him and law enforcement officers. He stated that when he was digging and found some clothing, the defendant said, "See, I told you so." Mr. Fisher said the location was off the highway in thick undergrowth. The state elicited from him that it was against the law for a person to give a minor drugs or alcohol. Also, Mr. Fisher said that from time to time Ronnie Walker tried to help law enforcement by providing information, but he did not recall if Walker assisted in this case.

Dr. William M. Bass, a noted anthropologist and head of the anthropology department at the University of Tennessee, testified regarding his examination of the deceased's remains and the burial site. He said the site was three hundred to four hundred yards off the road in a rhododendron thicket and a lot of roots covered the remains. Most of the clothing was off the skeleton.

Dr. Bass testified that the grave had been dug and a jean jacket placed at the bottom. A leg of a pair of bluejeans was on the ground and folded over the skull, covering it, with the remainder of the pants covering the torso. The pants were unzipped with the zipper corroded open. The bra had been removed and was over the left arm. The panties had been removed and were placed in the grave in the area of the knees. The only clothing remaining on the body was a red shirt.

Dr. Bass stated that some body tissue remained, including brain tissue. This was sent off for analysis. From his examination of the remains and the clothing, which had been identified by the deceased's family, Dr. Bass concluded that it was Kathy Clower's body.

Dr. Bass testified that he could not determine the cause of death from his examination. However, he stated that the manner of death was inconsistent with suicide or acci-

dent, given the fact of burial, the obvious involvement of another person in the burial, and the remoteness of the area in terms of lack of detection.

Norman A. Wade testified that he had analyzed the brain tissue when he was chief toxicologist of the T.B.I. laboratory. His analysis showed the presence of .19 milligrams of the substance doxepin. He said that a fatal dosage of doxepin would be 9 to 21 milligrams in the brain tissue. However, he stated that there was no way of knowing what concentration existed at the time of death because of what is known as postmortem redistribution. Also, he said that there was no way to know whether or not the deceased had taken other drugs because many, including alcohol, would break down over time.

Mr. Wade testified that doxepin is an antidepressant which causes sleepiness, blurred vision and dry mouth. He said that it would be an uncommon drug to abuse because it did not have pleasant effects. He admitted that it was prescribed for anxiety. Also, he said that doxepin would dissolve readily in Coke or beer. He stated that it was dangerous when mixed with alcohol.

Dr. Marvin G. Winegar, a psychiatrist, testified regarding the defendant coming to the Overlook Mental Health facility feeling tense and having difficulties sleeping. He saw the defendant on January 29, 1976, and diagnosed him as depressed with suicidal thoughts. Dr. Winegar prescribed sixty 50–milligram capsules of doxepin to the defendant and the defendant was to build up to taking three capsules at bedtime every day. He stated that his notes reflected that he advised the defendant of medical cautions, such as, drowsiness, driving with care, the bad affect of alcohol, and careful mixing with other drugs. Dr. Winegar saw the defendant on February 18, 1976, and the defendant had eighteen capsules left. The doctor decreased the daily dosage, but gave the defendant sixty more pills and prescribed him ninety valium tablets as well. The doctor's notes reflected that he prescribed the same dosages again on March 17, 1976.

Dr. Winegar stated that mixing doxepin with alcohol would increase sleepiness, as would mixing it with valium. He stated that valium did not dissolve very well in water or alcohol, but doxepin would. He said doxepin was bad tasting in Coke or water, but he could not detect it in beer.

Dr. Winegar testified that he believed thirty capsules would be lethal and that there would be significant impairment with two to four capsules if a lot of alcohol had been consumed. He said, "Well, if you've suddenly taken three capsules for the first time and beer, I would be willing to bet pretty good amounts of money you're going to be asleep within a couple of hours." He said that doxepin would stay in the body "roughly a day."

On cross-examination, Dr. Winegar admitted that he did not detail to patients the effects of mixing the drug with alcohol. He said that he basically told patients that they should not drink while taking the drug, but if they did, they should limit the amount and should not drive a car afterwards. When asked about an individual who might take one or two capsules, a significant amount of beer, smoked marijuana, and ingested LSD, the doctor acknowledged that "it would be a disaster." Also, he said that if a person were drinking alcohol, a lesser amount of doxepin would be needed to produce a fatality.

The defense recalled Joe Graves as its only witness. He testified that Peggy Raper Stanley told him on April 12, 1978, that the defendant said that a bunch of guys had a girl out, that she was on dope, that she was dead, and that he got scared and left. Ms. Stanley told him that the defendant told her this several times and was crying. He said that Ms. Barnett did not tell him anything about the case in 1978, but he acknowledged that he did not talk to her then.

I

The defendant contends that the state failed to prove the corpus delicti and the presence of malice necessary for second degree murder. Also, he asserts that the evidence was entirely circumstantial and failed to exclude every reasonable hypothesis except that of guilt as required under Tennessee law. *See State v. Crawford,* 225 Tenn.

478, 470 S.W.2d 610 (1971); *Marable v. State,* 203 Tenn. 440, 313 S.W.2d 451 (1958).

■ When the sufficiency of the evidence is questioned on appeal, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). This means that the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from it. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn.1978). Likewise, the determination of the weight and credibility of the testimony of witnesses and reconciliation of conflicts in that testimony are entrusted exclusively to the trier of fact, in this case the jury. *State v. Sheffield,* 676 S.W.2d 542, 547 (Tenn.1984); *Byrge v. State,* 575 S.W.2d 292 (Tenn.Crim. App.1978). Further, the standard for appellate review is the same whether the conviction is based upon direct or circumstantial evidence. *State v. Johnson,* 634 S.W.2d 670, 672 (Tenn.Crim.App.1982).

■ Literally, corpus delicti means the body of the crime. It must be proven beyond a reasonable doubt before a conviction may be had. *Foster v. State,* 180 Tenn. 164, 172 S.W.2d 1003, 1007 (1943). "Two elements make up the corpus delicti in a homicide case: (1) the death of a human being; and (2) criminal agency in producing that death." *State v. Driver,* 634 S.W.2d 601, 605 (Tenn.Crim.App.1981); *Kyle v. State,* 208 Tenn. 170, 344 S.W.2d 537 (1961). The defendant contends that the state's failure to prove the cause of death resulted in its failure to prove that a crime was committed. However, although submitting direct evidence of the cause of death, as a practical matter, may be the best way to show involvement of criminal agency, it is not always necessary, and such agency may be shown by circumstantial evidence even if the exact cause of death remains unproven. *State v. Driver, supra,* 634 S.W.2d at 606. In *Driver,* aside from the defendants' statements, this Court looked to various factors indicating criminal activity including evidence of the

isolated, desolate area in which the victim's remains were found, of the victim having no personal means of transportation to get to that area, and which precluded the reasonable possibility of suicide.

■ The evidence against the defendant starts with his own statements. He told Billy Gentry that the deceased went to Florida with some boys. He told Peggy Raper Stanley that some boys overdosed a girl, she died and was buried. He said to Ann Barnett that he killed a girl and buried her. He first told Deputy Graves that he was partying with the deceased, that drugs were bought, that the death occurred and that he buried her. He then told Graves that he and the deceased got acid and marijuana, were partying with others, that he was drinking, that he left and others told him that the deceased was taken to a truck stop. While the corpus delicti cannot be established by the defendant's statements alone, they may be considered in connection with other evidence, direct or circumstantial, to show the corpus delicti. *See Ashby v. State,* 124 Tenn. 684, 139 S.W. 872 (1911).

The deceased was a minor and was not suicidal. Mr. Gentry said the defendant bought and supplied beer to the deceased. Ronnie Walker testified to beer, LSD and marijuana being used by the defendant, the deceased (who was with the defendant) and others. The defendant possessed doxepin, which was not a common recreational drug. The defendant showed the police the place of burial where the deceased's remains were found. Doxepin was found in the deceased's tissue.

Also, the evidence reflects various actions by the defendant which each may result in an inference of guilt when coupled with the other circumstances. The body was concealed in an isolated grave. *State v. Cate,* 746 S.W.2d 727, 729 (Tenn.Crim.App.1987). He gave contradicting statements of the deceased's whereabouts after she was missing. *See* 1 *Wharton's Criminal Evidence,* § 147 (Charles E. Torcia ed., 13th ed. 1972). He escaped and fled the state after he was charged. *State v. Braggs,* 604 S.W.2d 883, 886 (Tenn.Crim.App.1980). In varying de-

grees, these actions were consistent with guilt and inconsistent with innocence.

From all of the evidence, the jury could rationally conclude beyond a reasonable doubt that the deceased died by means of a criminal agency. Also, it was sufficient to prove that the perpetrator was the defendant, which is necessary to convict even though the identity of the wrongdoer is not part of the corpus delicti. *Kyle v. State, supra,* 344 S.W.2d at 538. What is more difficult in this case, though, is the determination of whether or not the evidence was sufficient to show that the crime was murder, as opposed to a lesser degree of homicide. The inference of guilt which may flow from flight, concealment of the body, and false statements is a general one and does not provide weight to the degree of homicide which may be involved. *See Waldie v. State,* 190 Tenn. 537, 230 S.W.2d 993, 995 (1950).

■ At the time of the offense, second degree murder was the unlawful killing of another with express or implied malice aforethought. T.C.A. §§ 39–2–201, –211(a) [repealed]; *State v. Johnson,* 541 S.W.2d 417, 418 (Tenn.1976). Second degree murder was not limited under these statutes to an intentional killing. "[A]n unintentional killing constitutes murder in the second degree, if the death results from a consciously unlawful act done intentionally and with knowledge on the part of the accused that the act was directly perilous to human life." *State v. Johnson, supra,* 541 S.W.2d at 418. As *Johnson* indicates, the cases presenting the most difficulty involve situations in which the requisite malice has to be implied from the surrounding circumstances. *Id.* In any event, it is the jury's province to determine the degree of homicide shown by the facts and the circumstances surrounding the killing may justify an inference of malice. *Wilson v. State,* 574 S.W.2d 52, 55 (Tenn.Crim. App.1978).

On appeal, the state argues that the proof showed that the deceased was killed on the night she was with Billy Gentry and the defendant. It reasons that the defendant "probably" intended to rape the deceased, a position it reaches because the clothes were off the deceased. It contends that he "prob-

ably" overdosed the deceased on doxepin to achieve this end, a position it reaches because the defendant possessed doxepin and from speculating that the defendant placed it in the deceased's beers. This theory was not pursued by the state in the trial court. The state argued to the jury at the trial that it was obvious that the deceased did not die on the night of the Gentry meeting, but on the night of the last party about which Ronnie Walker testified. It argued that the deceased was possibly choked to death, or possibly smothered when buried alive, or possibly died of an overdose.

■ These arguments move us to note that a conviction for a criminal offense may not be based upon conjecture, guess, speculation or mere possibility. *Rucker v. State,* 174 Tenn. 569, 129 S.W.2d 208, 210 (1939); *State v. Jenkins,* 733 S.W.2d 528, 531 (Tenn.Crim. App.1987). There was no evidence from which strangulation or suffocation could rationally be inferred to have occurred. Also, if Ronnie Walker's testimony is believed, the fact that the defendant and the deceased went to the bedroom at the Harris trailer could militate against a conclusion that the state of the deceased's clothing showed that a forcible rape was intended or occurred.

However, the theory pursued by the state regarding the deceased dying of an overdose of drugs has substantial support in the record. We recognize that the defendant's statement to Ms. Stanley that a girl was overdosed, died and buried attributed the actions to others, not the defendant. Yet, as with the testimony of witnesses, the jury was entitled to believe a part of the defendant's statements while rejecting other parts. *See Batey v. State,* 527 S.W.2d 148 (Tenn.Crim. App.1975). Simply put, the jury was entitled to attribute the overdosing to the defendant, not others, when combining the statement with the defendant's admission to Ann Barnett that he killed and buried a girl. Such a conclusion is corroborated by the fact that the deceased, while with the defendant, had been mixing alcohol and drugs, was found buried, and her remains contained doxepin, a drug possessed only by the defendant. Indeed, the conclusion is entirely consistent with the defendant's first statement to Depu-

ty Graves which indicated that the defendant awoke to find the deceased dead. Likewise, the defendant's statement that he killed a girl reflects an admission that he was an active cause of the death.

There were circumstances which existed from which the jury could conclude beyond a reasonable doubt that malice existed. The evidence showed that the deceased was a minor and that the defendant was a contributor to her use of substantial quantities of alcohol and drugs. The evidence showed that doxepin is a powerful sedative and that the defendant was aware of this fact. Also, the psychiatrist had told him that mixing it with alcohol had a bad effect and that he should be careful in mixing it with other drugs.

In *State v. Randolph*, 676 S.W.2d 943 (Tenn.1984), our Supreme Court considered the potential criminal liability of an illegal drug seller for the drug-related death of a customer. It determined that such a transaction could constitute involuntary manslaughter in certain circumstances because it would result in the unlawful killing by the unlawful sale of drugs. Also, the Supreme Court recognized that circumstances could exist which would allow for a second degree murder conviction to arise from the dispensing of drugs to a user who died therefrom when it is shown that a defendant acted with such conscious indifference to the consequences of the "highly unlawful activities" as to evince malice. 676 S.W.2d at 947. Under this test, we conclude that the evidence was sufficient to support a rational trier of fact's determination beyond a reasonable doubt that malice existed in this case.

## II

The defendant contends that the statements he made to Deputy Graves and the fact of his showing authorities where the deceased was buried should have been excluded because this evidence was not voluntarily disclosed by him. His complaint is based upon his contentions that he was questioned for many hours straight, without benefit of making a phone call, that he and his family were threatened by the police, and that the police physically abused him. He also points to the fact that he refused to sign a form waiving his rights.

The evidence at the suppression hearing reflected that the defendant was arrested in early April, 1978, in Gastonia, North Carolina. Richard Fisher, Deputy Graves and Officer Wayne Atkins went to North Carolina and began questioning the defendant in the pre-dawn hours. The defendant testified that they began questioning him about 3:20 a.m. and that they threatened to arrest his parents, take their property and take his children away. He said that he was punched in the stomach, grabbed by the throat and his head was pushed against the wall. He said he was not advised of his rights until the afternoon and that they refused to allow him to make a telephone call to his parents.

The defendant stated that he was taken back to Monroe County and his hands were handcuffed through the bars of his cell. He said the jailer would scrape his hands. He was then taken to the McMinn County Jail. He testified that the night before he talked with Graves and led the police to the deceased's grave, officers took him from his cell, ripped off his clothes and beat him with a broom handle. Finally, he testified that, after being moved to Bradley County, he was beaten by a jailer. He said the only time he was advised of his rights was in North Carolina. On cross-examination, the defendant acknowledged that he had been read his rights for three previous arrests.

Fisher and Graves testified that they began questioning the defendant in North Carolina at 4:00 or 5:00 a.m., after he was given his *Miranda* warnings. The defendant declined to sign anything, but said he would talk to them. They denied use of or knowledge of physical abuse to or threats against the defendant or his family. Also, Fisher denied knowledge of any abuse while the defendant was held in Tennessee. Graves said that the questioning ended before noon and that there had been a break for breakfast. He said that the defendant did not request them to stop the questioning.

Graves further testified that when he questioned the defendant in Tennessee, he would read the defendant his *Miranda* rights. He

said that the night before the defendant led them to the deceased's grave, the defendant said that he would tell them where Kathy Clowers was last seen, if he, the defendant, could talk to his father. After talking to his father the next morning, the defendant showed them where the deceased was buried. Graves said that the defendant gave him the first statement after requesting to talk to him and Graves advising him of his rights, again. Later, in the Bradley County Jail, the defendant gave Graves the second statement, but Graves had not warned the defendant of his rights before it.

The trial court accredited the state's proof and found that the defendant's testimony was not believable. It held that the defendant's statements to Graves did not result from abuse, fear, threats or coercion, but were freely, knowingly and voluntarily made. It made a similar finding regarding the defendant's leading police to the burial site.

 The issue of the credibility of witnesses in a suppression hearing rests with the trial court, since it has the opportunity to hear and observe the witnesses during their testimony. *State v. O'Guinn,* 709 S.W.2d 561, 565 (Tenn.1986); *Houston v. State,* 593 S.W.2d 267, 271 (Tenn.1980). Further, on appeal, the losing party has the burden of showing that the evidence dealing with *Miranda* compliance and voluntariness preponderated against the trial court's findings. *State v. O'Guinn, supra; Braziel v. State,* 529 S.W.2d 501, 506 (Tenn.Crim.App.1975).

The testimony accredited by the trial court reflects that the defendant was advised of his *Miranda* rights, was otherwise aware of them, and waived them. Likewise, in discrediting the defendant's testimony and accrediting the accounts given by Fisher and Graves, we determine that there is ample evidence to support the trial court's conclusion that the defendant's statements and actions were freely and voluntarily made. The defendant was not entitled to their exclusion from the evidence.

### III

 The defendant contends that the jury was prejudiced by pretrial publicity to the extent that he was unable to obtain a fair and impartial trial. We note that he did not pursue a change of venue. However, he raises the issue in the context of what the jurors who heard the case had actually seen and heard, primarily regarding the "Unsolved Mysteries" program.

The issue is best approached by beginning with an account of the October 5, 1988, episode of "Unsolved Mysteries" which carried a twelve minute segment regarding the defendant, whom it depicted as being involved in the murder of two teen-age girls. The show contained dramatized reenactments and comments from relatives of the victims, Deputy Graves and then-Attorney General Fisher.

Most of the segment was used to show that the defendant killed one Roxanne Woodson. Reenactments showed (1) the defendant assaulting Ms. Woodson at night in a car and her running into the woods; (2) the defendant getting a shotgun and firing it when officers went to his family's home to question him about Ms. Woodson's disappearance; (3) the finding of Ms. Woodson's body buried in the defendant's family's backyard, including a close-up of two hands protruding from the ground; and (4) the defendant's interrogation by Deputy Graves, Officer Atkins and Mr. Fisher, with Graves telling the defendant that they do not believe his story and that they have the body.

The program narrator stated that, although the defendant never admitted being responsible, he made two statements which acknowledged that he tried to seduce Ms. Woodson and that she ran into the woods with him giving chase. In the first statement, he denied finding her, but in the second, he said she fell and hit her head and he buried her.

Fisher personally appeared and said that the defendant was charged with first degree murder. The narrator stated that a judge found that there was enough evidence to charge the defendant with first degree murder.

As to Kathy Clowers, the program reenacted the defendant showing where her grave was and Fisher's digging and finding clothing. Fisher appeared personally and

said that the defendant with a "cold smile on his face" said, "See, I told you so." Fisher stated that there was no emotion. Also, he stated that the jean pants leg was wrapped around the body "like Roxanne."

A reenactment depicted the defendant's escape from jail with two other inmates. Graves appeared personally and stated that he felt certain that the defendant was a danger to society, had a criminal mind and felt no guilt. After an appearance by Ms. Woodson's grandmother, the segment ends with Graves stating that the defendant is a "cold-blooded, psychopathic killer."

The defendant was originally charged in an eleven-count indictment relative to the murders of Kathy Clowers (1976) and Roxanne Woodson (1978), the rape of two women (1977), the rape and kidnapping of two other women (1978), and the aggravated assault on two law enforcement officers (1978). The trial court severed the charges in such a manner that the charge in this case would be tried separately from the others, indicating in its opinion that the various offenses were not all part of a common scheme or plan nor would the other offenses be admissible in this case in the state's proof-in-chief. *See* Tenn. R.Crim.P. 14(b).

The record reflects that at least nine of the members of the jury had seen the "Unsolved Mysteries" program about the defendant. Ten of the jurors were aware that the defendant was charged with more than one murder, with several of them acknowledging that they were aware of rape charges, as well. The record reflects that the main events recalled by two of the jurors related to the Woodson killing. One juror stated she had seen the program, read newspapers and seen television reports about the defendant. She said she knew the defendant was accused of killing two girls, raping two girls, assaulting an officer, and escaping from jail.

A second juror indicated that she had "kind of" formed the opinion that the defendant was guilty and that other people had expressed their opinion to her that he was guilty. She said she heard about the two murders, rape charges and the escape. She said that one or two people before the trial had expressed to her their hope that she would find the defendant guilty if she were on the jury. When asked by the trial court if she could wipe what she heard from her mind and base her decision solely upon the evidence, the juror replied, "I would try." When asked if she could give the defendant a fair and impartial trial based upon the evidence, the juror stated, "I believe I could."

Another juror, when asked if he had formed an opinion as to the defendant's guilt, stated, "Well, I guess that I formed the opinion that if they wanted to hang him, I'd furnish the rope." The trial court asked this juror if his statement was "sort of a manner of speaking" and "just idle talk" to which the juror replied, "Right, idle talk, yes, sir." Upon further questioning by the trial court, the juror stated that he had no question in his mind that he was satisfied that he could give the defendant a fair and impartial trial based upon the evidence.

The defendant exhausted all his peremptory challenges during the selection process. Further, he had challenged each of the selected members of the jury for cause, primarily as to all the jurors who had seen the "Unsolved Mysteries" program or otherwise knew about crimes involving the defendant other than the one on trial. The trial court refused to excuse these jurors.

The state asserts that the record reflects that each juror stated that he or she could give the defendant a fair and impartial trial, put aside any information known about the case and determine the case on the evidence. It argues that because each of the jurors stated unequivocally that he or she could be impartial and not affected by outside information, the trial court properly refused the challenges for cause. It cites Tennessee and federal cases which dealt with jurors' pretrial knowledge of events regarding the case on trial and which essentially state that a juror need not be excused for cause if he or she unequivocally shows impartiality and an ability to decide the case on the evidence. *See, e.g., Sommerville v. State,* 521 S.W.2d 792, 797 (Tenn.1975); *State v. Delk,* 692 S.W.2d 431, 437 (Tenn.Crim.App.1985); *United States v. Smith,* 748 F.2d 1091, 1093–1094 (6th Cir.1984).

Relative to challenges of prospective jurors for cause, Rule 24(b), Tenn.R.Crim.P., provides in part as follows:

Any party may challenge a prospective juror for cause if:

(1) There exists any ground for challenge for cause provided by law; or

(2) The prospective juror's exposure to potentially prejudicial information makes him unacceptable as a juror. Both the degree of exposure and the prospective juror's testimony as to his state of mind shall be considered in determining acceptability. A prospective juror who states that he will be unable to overcome his preconceptions shall be subject to challenge for cause no matter how slight his exposure. If he has seen or heard and if he remembers information that will be developed in the course of the trial, or that may be inadmissible but is not so prejudicial as to create a substantial risk that his judgment will be affected, his acceptability shall depend on whether his testimony as to impartiality is believed. If he admits to having formed an opinion, he shall be subject to challenge for cause unless the examination shows unequivocally that he can be impartial.

Even accepting the state's argument, we do not conclude that the juror who had "kind of" formed an opinion as to guilt evinced an unequivocal declaration of impartiality when she stated that she would "try" to base her decision solely upon the evidence and indicated that she "believe[d]" she could give the defendant a fair and impartial trial. *See, e.g., State v. Kilburn,* 782 S.W.2d 199, 203 (Tenn. Crim.App.1989).

However, we do not view the statements of impartiality elicited from the jurors by the trial court wholly dispositive of the issue. Rule 24(b)(2) provides that information possessed by jurors which would be inadmissible in the trial may be so prejudicial that a juror must be excused because of the substantial risk of prejudice regardless of the juror's statements of impartiality. This provision does nothing more than recognize the limits of our human condition.

There are limits to the human mind. We think to say to any jury, there is evidence here the defendant before you has been guilty of several prior crimes but you are not to consider this in determining his guilt or innocence of the present crime, is at best to severely test the ability of the mind to remove all prejudice therefrom. *Harrison v. State,* 217 Tenn. 31, 394 S.W.2d 713, 717 (1965). Clearly, Rule 24(b)(2) differentiates between a juror's knowledge of information which will be admissible at trial and knowledge of information which is inadmissible, but inherently prejudicial.

The rule recognizes that the risk of a juror being influenced by admissible evidence—which will be introduced at the trial to influence anyway—is acceptable in our system, if the juror's unequivocal claim of impartiality is believed. Obviously, such knowledge does not inherently interfere with the reliability of the truth finding process at trial. On the other hand, the juror's knowledge of information which is inadmissible at trial because of its prejudicial effect may, depending upon the amount of prejudice, improperly influence a juror and undermine the reliability of the trial result regardless of the juror's good intentions. Because of this risk, the rule implicitly places the burden upon the trial court to assess the level of prejudice apart from the juror's statements.

In this case, those jurors who saw the "Unsolved Mysteries" program received a graphic depiction of the Roxanne Woodson events, including a judge's determination that the evidence was sufficient to charge the defendant with first degree murder and the opinion by Graves, who would appear as a witness before them, that the defendant was a "cold-blooded, psychopathic killer." Also, the jurors were made aware of the defendant's purported assaults on officers investigating the Woodson case. It would be highly doubtful that any rational mind would not be affected by the program.[1]

The questioning of the jurors was not in depth, leaving the record to indicate that various jurors' recall of the program, occurring over two years earlier, was not in great

---

1. In fairness to the trial judge, the record reflects that he did not see the program and that the video recording of it was not made a part of the record until the trial was concluded.

detail. However, there is no ·question that a large majority of the members of the jury had knowledge of the Woodson killing and the defendant's reported connection therewith. Also, several jurors were aware of other rape charges against the defendant.

In every criminal case the defendant is entitled to have his guilt or innocence determined by impartial and unbiased jurors who have not been subjected to the influence of inadmissible and prejudicial information such as knowledge that the defendant has been convicted or accused of other crimes, especially of crimes substantially similar to that for which he is standing trial.

*State v. Claybrook,* 736 S.W.2d 95, 100 (Tenn. 1987).

This Court has previously had occasion to hold that a juror's knowledge of the defendant's commission of other crimes was highly prejudicial and resulted in the obligation to excuse the juror regardless of whether or not the record reflected that the juror could or could not be rehabilitated. In *State v. Caffey,* 729 S.W.2d 266 (Tenn.Crim.App.1986), the defendant complained about the midtrial removal of a juror who overheard that the defendant was serving a lengthy prison sentence. The defendant was denied the opportunity to rehabilitate the juror and argued that it was error to excuse the juror without the record showing the juror's inability to be fair. The Court noted that Rule 24(b)(2) provides that consideration of the juror's acceptability must include a review of his statements about his ability to be impartial only when the exposure is to matters "*not* so prejudicial as to create a substantial risk that his judgment will be affected." The Court stated:

Thus, the standard the defendant asserts does not apply when the information *is* so prejudicial that it will affect a juror's judgment. It goes without saying that evidence of a defendant's criminal history is thought to be so prejudicial that it is admissible only under very limited circumstances.

There was no error in the court's action. Having determined the information was extremely prejudicial and not freely admissible at trial, the court had a positive obligation to excuse the juror without further inquiry.

*Id.* at 269. *Accord State v. Kilburn, supra.*

In *State v. Delk, supra,* relied upon by the state, this Court remarked that the evidence was such to result in a close case and found significant the fact that the jury imposed the minimum sentence of ten years for second degree murder. "This fact in itself tends to establish that the jury was not swayed prejudicially by prior knowledge of the case." 692 S.W.2d at 437. In similar fashion, considering solely the evidence in this case, the jury's imposition of a ninety-nine-year sentence raises a serious concern that the jury was affected by its prior knowledge of the defendant and his other alleged crimes. Likewise, given the evidence in this case, the jury's acquittal on the first degree murder charge does not significantly lessen that concern.

The record reflects that the trial court rested its refusal to excuse jurors on its assessment of how firmly a given juror asserted the ability to be impartial. However, it is clear that Tenn.R.Crim.P. 24(b)(2) requires the trial court to assess the prejudice which inheres in the inadmissible information possessed by a juror and to determine, regardless of the juror's statements, whether the amount of prejudice creates a substantial risk that the juror's judgment will be affected. This was not done in this case, even though the trial court had already determined in its severance ruling that the other charges and proof thereon were not admissible.

Regardless of how heinous the offense or how depraved an accused may be proven to be, our constitutional system of justice demands that the determination of guilt and imposition of sentence arise from a fundamentally fair hearing which includes the right to a fair and impartial jury. This right is meant to protect *all* who are prosecuted and who prosecute.[2] We conclude that the

---

**2.** In Robert Bolt's *A Man for All Seasons,* the following quote is attributed to Thomas More:

"Would you cut a great road through the law to get after the devil? ... and when the last

amount of inadmissible information possessed by most of the members of the jury regarding the defendant's involvement with and charges for other crimes, particularly the Roxanne Woodson murder, was so prejudicial that a substantial risk existed that those jurors' judgments were affected. Accordingly, the trial court should have excused the jurors who possessed such knowledge and failure to do so constitutes reversible error.

## IV

■ The defendant contends that it was error to allow Ann Barnett to testify about the defendant giving her a pill and its effect on her. He argues that such testimony constituted inadmissible proof of other crimes, wrongs or acts tending only to show that he had bad or irresponsible tendencies. *See* Tenn.R.Evid. 404(b). In response, the state asserts that it was relevant because the defendant had contended that the deceased had voluntarily experimented with drugs and had argued that she had voluntarily ingested the doxepin. We hold that it was error to allow this testimony into evidence.

We fail to see how the defendant's giving Ms. Barnett a "high powered nerve pill" at a time later than the deceased's death is properly probative of whether or not he gave the deceased doxepin or she voluntarily ingested it. Rule 404(b) prohibits the use of other crimes, wrongs or acts to prove a character trait in order to show a person acted in conformity with that trait, that is, that the person had the propensity to act in such a manner. *See State v. Parton,* 694 S.W.2d 299 (Tenn.1985). Also, the Barnett event, occurring after the deceased's death, was not probative of what the defendant may have known about doxepin's effects at the time of the deceased's death. Finally, we note that the toxicologist testified that drugs affect individuals differently. Thus, the effect caused by the pill given to Ms. Barnett did not provide probative information regarding the effect of doxepin upon the deceased.

## V

■ The defendant contends that the trial court erred in not allowing him to impeach Billy Gentry by cross-examination about, and proving his commission of, perjury in another hearing. The argument is based upon the defendant's belief that another judge in Gentry's community corrections sentence revocation case determined that Gentry had perjured himself.

In this case, the defendant advised the trial court that he proposed to introduce into evidence the document containing an affidavit and warrant for the revocation. In the affidavit, the words "committed perjury in open court" were handwritten, followed by the other judge's name. The trial court refused to allow this proof. We hold that there was no error.

Evidence of a felony conviction or misdemeanor conviction involving dishonesty is admissible to impeach a witness. Tenn.R.Evid. 609. The document in this record does not constitute proof that Gentry was convicted of perjury and the defendant was not entitled to use it as such.

■ Also, even though there is no conviction, evidence of conduct involving dishonesty may be inquired into on cross-examination of the witness if certain conditions are met. Tenn.R.Evid. 608(b). Under 608(b), if the witness denies the conduct, the examiner may not prove the conduct by extrinsic evidence. In any event, the record in this case is far from clear regarding the defendant's desire to cross-examine Gentry in such fashion. In fact, the trial court's ruling was only that it would not "let that go in," a reference to the revocation document which the defendant showed to the trial court. The discussions with counsel and the trial court indicate that the defendant attempted to prove either the fact of Gentry's revocation warrant being based upon a perjury claim or the purported fact that the other judge had found that Gentry had committed perjury. Neither of these points was admissible under 608(b). We do not view the record showing that the trial court denied the defendant any right to

law was down, and the devil turned round on you—where would you hide ... the laws all being flat?

"Yes, I'd give the devil benefit of law, for my own safety's sake."

pursue appropriate cross-examination for impeachment purposes.

## VI

### (A)

 The defendant contends that the prosecutor improperly commented on the defendant's failure to testify when he stated to the jury in final arguments, "We all know that the only witness [sic] to this crime is the victim and Joe Shepherd." The Fifth Amendment to the United States Constitution prohibits a prosecutor from commenting upon a defendant's failure to testify. *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *see Staples v. State*, 89 Tenn. 231, 14 S.W. 603 (1890). Obviously, the state cannot seek to gain benefit through argument before the jury relating to the defendant's exercise of a constitutional right.

However, the context of the statement in issue does not lend itself to an inference that impinges upon the defendant's fifth amendment rights. The defendant had commented in his argument that the state had years to investigate the case and still had a weak case, depending upon circumstantial evidence. In response, the prosecutor was explaining that regardless of the amount of time to investigate, when there are no eyewitnesses other than the deceased and the defendant, the state's case must necessarily be based upon circumstantial evidence and must be proven by indirect means. The import of the state's argument clearly related to the significance of circumstantial evidence and the *state's* failure to produce eyewitnesses. It would be mere speculation to infer that the argument would be perceived negatively by the jury as a comment on the defendant's failure to testify. There was no error in allowing the argument.

### (B)

The defendant complains about other parts of the state's jury argument dealing with the defendant reveling in the limelight and his being an animal. As the defendant contends, a prosecutor's argument must be temperate, based on the evidence introduced in the trial and relevant to the issues. *Russell v. State*, 532 S.W.2d 268, 271 (Tenn.1976).

The state concedes that the evidence did not indicate anything about the defendant's attitude regarding publicity or the limelight. However, the record reflects that the defendant's objection cut off the prosecutor's argument in mid-sentence and the sentence was never finished. Indeed, the prosecutor's statement, in context, was wholly inconsequential to the substance of the state's position. The defendant is not entitled to reversal of his conviction unless the argument could have affected the verdict to his prejudice. *Judge v. State*, 539 S.W.2d 340 (Tenn. Crim.App.1976); *Harrington v. State*, 215 Tenn. 338, 385 S.W.2d 758 (1965); T.R.A.P. 36(b). We see no such prejudice in this case.

Also, the prosecutor's argument regarding an animal, to which the defendant objected, was not as the defendant portrays it. The prosecutor was simply suggesting that human beings are, in many ways, as territorial as animals and that the various locales represented by the evidence indicated the territory to which the defendant had laid claim. Attorneys are allowed to engage in "oratorical emphasis in arguing their respective positions" and jury argument is given wide latitude within the trial court's discretion. *State v. Prince*, 713 S.W.2d 914, 918 (Tenn.Crim. App.1986); *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn.1978). We do not view this argument as improper.

In consideration of the foregoing and the record as a whole, the conviction is reversed and the case is remanded to the trial court for further proceedings.

DWYER and BYERS, JJ., concur.

DWYER, Judge, dissenting.

I am in respectful disagreement with the majority remanding this record for a new trial. A reading of the voir dire proceedings leads the writer to conclude that this appellant was fairly tried and found guilty by an unbiased and impartial jury. It must be remembered that the appellant is constitutionally guaranteed a trial by a fair and impartial jury. He is not constitutionally guaranteed a perfect jury or trial.

The record reveals, as the State argues, that the trial court conducted its voir dire proceedings using groups of venire to make its determination of whether they were qualified to be jurors. The trial court then allowed the jurors to be called and examined individually by the appellant's counsel with the Attorney General generally accepting all that were called. Every juror who expressed a fixed opinion concerning the guilt or innocence of the appellant was excused.

While it is true, as stated by the majority, that a goodly portion of the jurors had seen the television depiction of the events prior to trial, each, upon oath, assured the appellant and the court that he or she would be impartial.[1] Indeed, the trial court, in an abundance of caution, individually interrogated all jurors selected to ensure appellant a fair trial. No more or no less is required. The prior knowledge of jurors was neutralized by their unequivocal assurance to the trial court that they would be impartial. *Sommerville v. State*, 521 S.W.2d 792, 797 (Tenn.1975); *State v. Delk*, 692 S.W.2d 431, 437 (Tenn. Crim.App.1985); *State v. Sammons*, 656 S.W.2d 862, 869 (Tenn.Crim.App.1982). Rule 24(b)(2), Tenn.R.Crim.P.

It is well settled in Tennessee that the trial judge has wide discretion in the examination of prospective jurors, and his action will not be disturbed unless there is an abuse of discretion. *State v. Jefferson*, 529 S.W.2d 674 (Tenn.1975); *State v. King*, 718 S.W.2d 241 (Tenn.1986). Here, the trial court observed firsthand the jurors and their responses to the questions of appellant's counsel. Much deference should be given to the court's determination of the credibility of each juror. My review of the voir dire proceedings reflects a conscientious, patient trial court ensuring the appellant a trial by an unbiased and impartial jury.

I cannot agree with the majority's conclusion that the prior knowledge of appellant's other crime caused the jury to impose the high sentence. A fair reading of this record reveals an adult appellant plied a sixteen-year-old, learning disabled child with alcohol and drugs. The psychiatrist testified that mixing the drug Doxepin with alcohol and other drugs would be a "disaster." The burial of the child, the removal of her clothes, and the admissions of the appellant that he killed the child would fully support the imposition of the ninety-nine-year sentence. Moreover, I cannot agree with the majority's conclusion that the trial court abused its discretion; therefore, I would affirm the judgment of the trial court.

## ORDER ON PETITION TO REHEAR

The state has filed a petition to rehear in this case, asserting two concerns. First, it contends that this Court failed to review the trial court's refusal to excuse jurors for cause under an abuse of discretion standard. *See Burns v. State*, 591 S.W.2d 780, 782 (Tenn. Crim.App.1979). The concern is misplaced. The majority opinion is based upon the record reflecting that the trial court relied solely upon the jurors' responses to voir dire questioning without considering if the information known to jurors was so prejudicial as to create a substantial risk of their judgment being affected, a consideration which Tenn. R.Crim.P. 24(b)(2) inherently requires if the information is inadmissible in the trial of the case. *See State v. Kilburn*, 782 S.W.2d 199, 203 (Tenn.Crim.App.1989). In holding that the inadmissible information, particularly regarding the defendant's involvement in another murder, possessed by the jurors was so prejudicial as to require excusing those jurors for cause, it is inherent in the majority opinion that the trial court's action was viewed as an abuse of discretion.

Second, the state contends that the fact that the defendant did not request a change of venue should have significant bearing on the issue regarding the makeup of the jury. It relies upon *United States v. Morales*, 815 F.2d 725 (1st Cir.1987) which held that an accused who expressly declines to seek a venue change

> carries a significantly heavier burden to show that widespread community publicity concerning the crimes of which he is charged render his trial presumptively un-

---

1. Indeed in rural counties it would be wishful thinking to find a juror who had not seen, read

or talked about an infamous event of this magnitude.

fair—that, because of the publicity alone, the jurors drawn from the district where he insists he has a right to be tried are presumptively unfit to meet the "impartial jury" standard of the sixth amendment.

*Id.* at 739. We note that the publicity in *Morales* related primarily to the issues on trial and that the federal system has no rule of procedure similar to our Rule 24(b)(2). Again, the state's concern is misplaced, indicating a misapprehension of the holding in the majority opinion.

The decision in this case is not based primarily upon pretrial publicity about the events on trial or upon the presumption of prejudicial knowledge which may be made from such publicity when the issue relates to a change of venue. Rather, the opinion is grounded upon the knowledge possessed by the jurors who sat in judgment of the defendant. Regardless of there being pervasive pretrial publicity or no publicity at all, a fair and impartial jury, as contemplated by Rule 24(b)(2), would not include jurors who actually possessed knowledge of inadmissible information which is so prejudicial to one of the parties that a substantial risk exists that the jurors' judgment would be affected. The assessment of prejudice stems from the information known to the jurors and not from presumptions arising from the extent of pretrial publicity. The exclusion of such jurors is not contingent upon a request for a change of venue being made. The petition to rehear is denied.

DWYER, Judge, dissenting.

Adhering to my views as expressed in my dissent in this record, I would grant the State's petition to rehear.